The General German Aged People's Home of
Baltimore City vs. John G. Hammerbacker,
Paulus F. Hammerbacker and Samuel J. Har-
man, Administrators c. t. a. of George Zolles,
and others.

*Home for Aged persons—Condition of Admission—Ultra
vires—Public policy—Applicant for Admission—Fraud—
Relief in Equity.*

Certain persons were incorporated for the purpose of establishing and
maintaining an institution wherein aged people of both sexes of
good moral character, under such conditions and rules as might be
prescribed by the constitution and by-laws of the corporation,
might find an asylum. One of the conditions of admission into
the institution, besides the payment of the stipulated entrance fee,
was that the applicant should transfer to the institution all prop-
erty or income of any kind which he might have. Held:

That such condition was neither *ultra vires*, nor against public policy.

Z., an applicant for admission into the institution knowing the con-
ditions of admission, and assenting thereto, having declared in
writing, that he had no property other than the sum of $300, the
amount of his entrance fee, was received into the institution with-
out a conveyance of his property as provided in the constitution.
He remained in the Home until he died. After his death, it was
discovered that at the time of his application, he had some $1200
in money and notes. In a contest between the Home and the
administrators of Z., it was Held:

1st. That the deceased had perpetrated a fraud upon the Home in
securing his admission without a legal conveyance of his property.

2nd. That the institution having no remedy at law, was entitled to
relief in equity, against the administrators of the deceased.

Appeal from the Circuit Court of Baltimore City.

This is an appeal from a decree of the Court below sus-
taining a demurrer to the bill of complaint, and dismiss-

ing the same. The case is stated in the opinion of the Court. Paragraph c of section 2, of Article 5 of the Constitution of the appellant, referred to in the opinion of the Court is as follows : "By transfer to the institution of all property or income of any kind which he may happen to have, to render himself (or herself) without means or income." The following contract was signed by the applicant, George Zolles, and two others in his behalf :

"And we further covenant and declare, that George Zolles is not now the owner of any property, real or personal, and not the recipient of any income, dividend, interest, rent, pension or other moneys, and not expecting any such by inheritance or otherwise, except what has been mentioned and transferred to the institution in due form ; and that should he in any way or by any means whatever become the owner of property or income, we will use all proper means to have the same at once transferred and conveyed to the president and directors of said institution, in accordance with their laws, rules or resolutions."

The cause was argued before ALVEY, C. J., YELLOTT, STONE, MILLER, ROBINSON, IRVING, RITCHIE, and BRYAN, J.

*Jacob J. H. Mitnick,* and *Louis P. Hennighausen,* for the appellant.

A fraud has been committed upon the appellant and is about to be finally consummated. The appellees' testator received the full benefit of a contract with the appellant, and the appellees as his administrators now seek to recover property, which according to that contract, and as a part of the consideration for the benefits which he enjoyed under it, had been agreed should pass from the appellees' testator to the appellant, and which he fraudulently withheld, and which, in the absence of fraud on his part, would have been transferred to the appellant, but the transfer of which was prevented solely by his fraud.

There can be no doubt that the expression of a willingness to transfer all his property to a direct question to that effect, and his signing the contract stating that he is not possessed of property other than that which he had transferred, amounted at least to a contract to transfer all his property to the appellant. The bill shows further that it was the intention of the parties to the bargain that all his property *should be transferred* to the appellant before his admission, and before his admission he signed a contract solemnly assuring the appellant that he had transferred all his property ; but that by his *fraudulent concealment and misrepresentations* he kept the appellant in ignorance of his ownership of the property in controversy, and therefore it was not transferred. For these reasons the money belongs in equity to the appellant. Equity treats as done, acts which are fraudulently prevented, and allows no one to reap advantage of his own frauds. 1 *Story's Equity Jur.*, sec. 256.

An implied or constructive trust has been created in favor of the appellant. A Court of equity acts upon the ground of implied trusts *in invitum*, where a party has received money which he cannot conscientiously withhold from the other party. 2 *Story's Equity Jur.*, sec. 1255; 2 *Pomeroy's Equity Jur.*, sec. 1047.

And a Court of equity has jurisdiction in these cases, notwithstanding that an action at law would also lie. 2 *Story's Equity Jur.*, sec. 1256.

Where the legal title to property, real or personal, has been obtained through fraud, or "under any other circumstances, which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a *constructive trust* on the property thus acquired, in favor of the one who is truly and equitably entitled to the same." The forms and varieties of these trusts, which are termed *ex maleficio*, are practically without limit. 2 *Pomeroy's Equity Jur.*, sec. 1053 ; 1 *Story's Equity Jur.*, sec. 256.

There has been an equitable assignment of the property. Any order, writing or act, which makes an appropriation of a fund, amounts to an equitable assignment of that fund. 2 *Story's Equity Jur., sec.* 1047 ; *Wilson vs. Carson & Co.*, 12 *Md.*, 54, 74.

The appellees are *equitably estopped* from claiming the property in controversy against the *covenant of their testator*, that he was possessed of no property, other than that which he had transferred to the institution. A person cannot, nor can his legal representative deny the truth of a false representation on the faith of which another has acted, (2 *Pomeroy's Equity Jur., sec.* 804, and note, also preceding sections;) and the appellant is, therefore, entitled to an injunction restraining the appellees from bringing suit at law for the recovery of said property.

The appellant has no plain, adequate and complete remedy at law. The facts that the money was never transferred, that it is in the *hands of three different third parties,* and still in the name of Zolles, and that the appellees claim title to the money, render a resort to equity proper and necessary. The equitable jurisdiction in this case might also be maintained on the ground of specific performance. Specific performance of contract to mortgage personal property has been enforced. *Alexander vs. Ghiselin,* 5 *Gill,* 138; *Sullivan vs. Tuck,* 1 *Md. Ch. Dec.,* 59 ; *Triebert vs. Burgess,* 11 *Md.,* 464.

The appellees suppose that they ought to get possession of the fund, so as to appropriate the same for the payment of debts of the testator. In the first place the bill and exhibits disclose no such debts ; (there are in fact none,) and if a constructive trust has been established, or the appellant is entitled to a specific performance, or there has been an equitable assignment or estoppel, the administrator has no right to the fund, even if there are debts. *Cowles vs. Whitman,* 10 *Conn.,* 21.

The contract or transaction by which Zolles gave up all his property to the appellant, was clearly within the scope of the object of the corporation. The charter specially provides that this shall be an asylum for old people *under such conditions and rules as may be prescribed by the constitution and by-laws.* Surely no one will say, that requiring all persons who are admitted into the Home to give up all their property to the Home is necessarily foreign to the object expressed in the charter founding an asylum for old persons, wherein the sole object shall be to make the last days of its inmates as pleasant, and free from care as possible.

It certainly cannot be more *ultra vires* for the appellant to acquire the property in controversy than it was for the Building Association to borrow money on promissory note in the case of *Davis vs. West Saratoga Building Union,* 32 *Md.,* 293.

But even if the transaction were *ultra vires,* the appellees are estopped from setting up this defence in the present case, the appellant having so acted on the faith of what Zolles did as to be unable to be placed in *statu quo.* Zolles obtained *admission* into the institution upon the faith of his representation and contract. He received the full *benefit of the object of the institution upon the faith of his representation and contract.* He in his life-time would certainly have been estopped from setting up the defence of *ultra vires. United German Bank vs. Katz,* 57 *Md.,* 142. To allow the defence of *ultra vires* in this case would clearly amount to a fraud upon the appellant, and would encourage others to perpetrate the fraud.

That a contract for the support and maintenance of an old, helpless or forsaken person, for the remainder of his life, for or without a consideration, if made by a person or body corporate competent to make such contract, should be against public policy, is a proposition that needs no refutation.

*Samuel J. Harman,* for the appellees.

The money in the Banks, and that mentioned in the note, claimed by the appellant, as equitable assignee, was in decedent's possession at the time he applied for admission into the Home, and until his death; and there are no facts stated in the appellant's bill constituting a contract on the part of the appellees' decedent for the transfer of the money and the books of deposit, as would amount to an equitable assignment of the same to the appellant. The answer of the decedent to an interrogatory propounded to him, in which he stated that he was willing to transfer his property and income to the appellant, had no reference to the transfer of the money in his possession, or in the Banks, or of the books of deposit, and, therefore, would not operate as an assignment thereof. Neither is there any language in what is termed the decedent's contract that would operate as a transfer, or an agreement to transfer the funds in controversy, to the appellant. Nor do the statements made by decedent in his examination by the appellant's committee, when taken together with the language of the contract, show such agreement for the funds in question. Besides the $300.00, paid by the decedent to the appellant on his admission into its Home, there was no other money or property specified or mentioned as the subject of transfer to the appellant. It is clear from the facts and circumstances of this case that the decedent never meant or intended to transfer to the appellant any other money or property than the $300.00, required of him for admission into the Home.

In order to create an equitable title in the assignee, the property must in some way be specifically pointed out. *Bispham's Equity,* (3d Ed.) 217, &c.

In order for the appellant to support its claim to an equitable assignment of the funds and note left by decedent, it is incumbent upon it to show such agreement on the part of the decedent which would operate as a

transfer of the specific funds in question. The bill and exhibits therewith, show no such agreement. 3 *Pomeroy's Equity Jur.*, sec. 1280 ; 1 *Pomeroy's Equity Jur.*, sec. 169.

From the whole context of the paper, termed the contract, there is nothing that can be gathered from the language therein that would make Zolles a covenantor, either joint or several. 2 *Parsons on Contracts*, (2d *Ed.*,) 7 ; *Platt on Covenants*, (3 *Law Lib.*,) 12 ; *Slater vs. Magraw*, 12 *G. & J.*, 265.

There is nothing in this paper that can be construed as an agreement by Zolles for a transfer of the funds in question to the appellant.

But conceding that the facts presented by the bill show an agreement on the part of Zolles to comply with appellant's constitutional requirement for a transfer to the institution, of all his property, at the time of his admission, such agreement would be a transaction *ultra' vires*, and could not be enforced by the appellant ; because by the terms of its charter it has no right or power to acquire property by such means or to make such a contract. *Foreman's Case*, 29 *Md.*, 524 ; *Gregg's Case*, 56 *Md.*, 256, 272 ; *Lazear's Case*, 52 *Md.*, 78.

By the fourth clause of the certificate of incorporation of the appellant, the acquisition of its property is expressly limited to the four following modes : By payment of dues by its members ; by donations ; by bequests, and by voluntary contributions. The appellant, by requiring an applicant, as a pre-requisite to admission into the Home, to transfer to it all his property and execute a contract for the transfer of property of which he might thereafter become the owner, is a mode of acquisition of property entirely contrary to either of the foregoing modes. The several certain modes of acquisition being therein definitely expressed, all other modes are thereby excluded. *Expressio unius, est exclusio alterius.   Thanhauser vs. Savin,* 44 *Md.*, 410.

The doctrine of estoppel announced in the *Katz Case,* 57 *Md.,* 128, has no application to this case. This appellant has no such equities appealing to the Court, as were mentioned in that case.

The fact that Zolles represented to the appellant that $300.00 was all the means or property he possessed, when he was examined for admission into the Home, when in fact he had a greater amount than that sum, and purposely concealed the fact, does not amount to legal fraud. The appellant was not deceived to its disadvantage and injured thereby; for there is nothing in the bill to show that the appellant's costs and expense for the keeping of Zolles while he was at the Home, not quite 16 months, together with the expense of his burial when he died, exceeded the $300.00 paid by him on his admission; which sum was the maximum amount fixed by section 3 of Art. 5, of the Constitution, for admission; and which, by the schedule of fees fixed by section 41 of the by-laws, was an overcharge to the extent of $50, for a person of Zolles' age. If the decedent committed a fraud by suppressing the fact that he possessed more than the $300.00, at the time of his admission, it was a fraud that worked no injury to the appellant. *Bisp. Equity,* (3d *Ed.,*) *sec.* 217; *McAleer vs. Horsey,* 35 *Md.,* 439, 450.

The doctrine of estoppel cannot be extended to permit a corporation to acquire property in a mode not sanctioned by its charter, nor to make contracts *ultra vires. Dandridge's Case,* 8 *G. & J.,* 320, *See Brantly's notes,* 156, *note* (c); *Foreman's Case,* 29 *Md.,* 524; *Weckler's Case,* 42 *Md.,* 581, 595; *Boyce's Case,* 46 *Md.,* 373; *Albert vs. Savings Bank,* 1 *Md. Ch. Dec.,* 413; *Bank vs. Boyd,* 44 *Md.,* 60; *Abbott vs. Steamboat Co.,* 1 *Md. Ch. Dec.,* 550; *Lazear's Case,* 52 *Md.,* 78–124; *National Bank of Rochester vs. Pierson, Thompson's Bank Cases,* 637; *Farmers & Mech. Bank vs. Baldwin,* 23 *Minn.,* 198.

If there has been a breach of the contract, the appellant has a full remedy at law against the administrators

of the decedent. He was admitted into the Home on the 20th of September, 1882, on payment in cash of $300, and died on the 12th of January, 1884 ; and whatever sum was expended by the appellant for decedent's maintenance, while in its Home, together with the expense incurred for his burial, over and above the $300 received at the time of his admission, the appellant can recover, under the ruling of this Court in *Foreman's Case*, 29 *Md.*, 524.

STONE, J., delivered the opinion of the Court.

The object of the incorporation of " The General German Aged People's Home of Baltimore City " was certainly a commendable one. Its aim was to furnish to aged and indigent Germans a home for the residue of their lives. It was intended for those only who were over sixty years of age, who were unable to work, and possessed of a good character, and without the means to secure for themselves a comfortable home. But with all these requisites before an applicant could be admitted, an admission fee, ranging from $300, the highest, to $150, the lowest, must be paid. This admission fee might be paid by the applicant himself, if he possessed sufficient means, or by his friends or relatives, if he was unable to do so. Another requisite for admission into the institution was, that the applicant should transfer to the institution all the property that he had at the time. It is this latter provision that creates the difficulty in this case, and which will require examination.

It is the primary purpose of this corporation to furnish homes for those who are unable to support themselves in any degree of comfort, and not for those who are so able. It is not its object to furnish for the small admittance fee of $300 or $150 a *home for life* to those who still hold property, to do as they please with. To allow that would be to convert the institution into a very cheap

boarding-house, where, in addition to comfortable board and lodging for life, the inmate would be entitled to medical attendance if sick, and a decent burial at his death, and all this for $300 at most. But there is and must be a large class of persons, who own and possess more property than enough to pay the admission fee, but not enough to support themselves in the comforts they would find at the Home. It was for this class that the provision in the constitution (Art. 5, sec. 2, paragraph c) required the inmate to transfer to the corporation all the property he might have, and it is this provision that is supposed to be *ultra vires*. But in our opinion it is not.

The certificate of incorporation provides, "That the corporation so formed, is a corporation for the purpose to establish and maintain in the City of Baltimore, or within its vicinity, an institution under the name of 'The General German Aged People's Home,' wherein aged people of both sexes, of good moral character, *under such conditions and rules as may be prescribed by the constitution and by-laws of this corporation, may find an asylum.*"

Among the rules laid down in the constitution, is the one heretofore referred to, that one of the conditions of admission was the transfer to the institution of all the property of the applicant.

The general corporation law of the State provides that every corporation incorporated under the general law, shall possess certain powers, and among these enumerated powers, is the right to acquire by purchase, or in any other manner not inconsistent with law, any property which is necessary or proper to enable such corporation to fulfil the purposes named in its certificate of organization. (See *sec.* 48 *of Corporation Law.*)

Under this general law, the corporation would be entitled to receive property, unless it was inconsistent with law, or unless the constitution and by-laws of this corporation forbade the acquisition of property in that mode.

But the constitution provides that the revenues of the corporation should be derived from the yearly dues of members, admission fees, donations, presents, legacies, and gifts. Now under this clause, to say nothing of the general law, a person, not an inmate or applicant, could certainly donate or give property or money to the institution. If A, not an inmate, presented the corporation with $1000, no one would doubt its power to receive it, under the head of a voluntary donation or gift. It certainly would be a hair-splitting rule to say that if B, who was an inmate, or an applicant, did the same, it would not be a donation or gift. It is not a purchase, for the inmate gets his right to be there, from his age, his good moral character, and the payment of his admission fee. He may not have a cent of money or property to convey, but if the other conditions are complied with, he is admitted. It is as properly classed as a voluntary donation, in the one case, as the other.

But it is argued, that such conveyance of property is against public policy. But public policy does not forbid the purchase of an annuity. By the payment of a sum in gross, the annuitant obtains a certain sum of money annually as long as he lives. This is much practiced in England, and somewhat in this country, and has never been held to be against public policy. There is no difference in principle between receiving a sum of money annually for life, and a home, including board and clothing, for life. If an applicant has money or property, the income of which is not sufficient to support him or her, in as much comfort as they can get at this Home, it is certainly not against public policy for them to dedicate it to securing to themselves the advantages of this institution. Indeed, where the applicant has no one depending upon him, it is commendable in him to do so.

Nor is it against public policy for an organized charity like this to receive such donations, it being, as we have

shown, within its corporate powers. On the contrary, this and similar charities are directly within the line of a sound and humane public policy. They not only tend to relieve suffering in the individual, but tend to keep them from being a charge upon the general public. For this purpose money is necessary, and they are allowed to receive and appropriate it as their charter allows.

But if we were in error about this, under the decision of this Court, in the case of *The United German Bank, use of Clendenin vs. Katz,* 57 *Md.,* 128, the defendants would be estopped from setting up such defence. In that case the defendant set up as a defence to the note sued on, and which had been discounted by the bank, the want of power in the bank so to ·do. But while the Court said that the bank had no such power, the defendant, having received the money, such defence was not available to him. That where the contract has been *executed,* by the plainest rule of good faith it should be permitted to stand. That although a corporation may act in *disagreement* with its charter, yet a party who has had the benefit of the agreement, cannot be permitted to question its validity.

We shall see hereafter that this agreement was fully executed by the complainant, and therefore neither Zolles, nor those claiming under him, can now set up such defence.

But our opinion as to the power of this corporation to require the applicant to convey to it all his property, must be confined to property owned and possessed by the applicant at the time.

As to its power, by bond or otherwise, to enforce the conveyance to it of any *future acquisition* of property, it is not necessary for us to express any opinion, as that question does not arise in this case ; the whole property now in dispute being owned·by Zolles at the time of his application for admission. We may say that some different principles might govern the case of future acquisitions.

The facts in this case are few and plain. One Zolles applied for admission into this Home. He acknowledged that he knew the rules of the institution relative to his admission, and assented to the same. He declared in writing that he had no property, except the sum of $300, his admission fee, and that he was willing to transfer all his property to the institution; and being found otherwise qualified he was admitted. He died in the institution in about a year and a half afterwards. After his death, the institution discovered that he had given them a false account of his property, and that he had some twelve hundred dollars in money and notes, which his administrators now claim, and threaten to sue for.

That Zolles practiced a fraud upon the institution is manifest from this statement. He did know the rules, and he made the most solemn declaration in writing that he had no other property beyond the $300. Had the appellants known of the money he had, they would not have admitted him to the Home until he had conveyed it to them by proper legal conveyance. But believing his statement, which was vouched for by two others beside himself, they did not deem it necessary to take a conveyance of property, when they believed there was none to convey.

The question then is, shall the representatives of Zolles now derive a benefit from his fraud? The appellants have performed the whole of their agreement with Zolles. They gave him a comfortable home for his life, proper attendance when sick, and a decent burial after his death.

That equity will consider that as done which ought to have been done, is too well settled to need a reference to authorities. The recent case of the *Equitable Gas Light Company of Baltimore vs. Baltimore Coal Tar and Manufacturing Co.*, 63 *Md.*, 285, was a case where there was a *fraudulent* refusal to execute a written contract, and the Court said :

"This agreement was of a distinctive character, and was looked to by both the contracting parties at the time as essential to the security of their rights. To allow either of the parties to evade its liability and get the advantage of the other by resorting to such a fraudulent subterfuge as that charged upon the defendant, would be against all equity and conscience, and such as no well-adjusted system of jurisprudence could tolerate. The authorities, we think, fully warrant a Court of equity in the exercise of its jurisdiction in such case, to enforce the production of the contract fraudulently withheld, to the injury of the plaintiff, *or to enforce the due and proper execution of the contract, if such execution be fraudulently and without justifiable excuse delayed, to the injury of the plaintiff;*" and in support of that position, several authorities are referred to.

That a Court of equity will decree the specific performance of a contract where the execution was prevented by fraud, is very clearly laid down in that case. While Courts of equity do not specifically enforce contracts in respect to personal property, with the same facility as contracts relating to real estate, because in the former case, the Courts of law are generally competent to afford relief, yet whenever the party cannot have at law a full and satisfactory remedy, a Court of equity will grant relief. 2 *Story's Eq.*, sec. 717; *Alexander vs. Ghiselin*, 5 *Gill*, 138; *Sulivan vs. Tuck*, 1 *Md. Ch. Dec.*, 59; *Triebert vs. Burgess; et al.*, 11 *Md.*, 452.

In this case it is clear that the complainants can have no full and adequate remedy at law. The complainants, by reason of the fraud practiced by Zolles, have not a *legal* title to the property, such as would enable them to maintain an action at law. Their title is an equitable one, and relief, therefore, can only be obtained through a Court of equity. If this property was delivered over to the administrators, and the complainants forced to file a bill against

them, it would only be a needless circuity of action and anunnecessary expense.

We are, upon the whole case as made by the bill, of opinion, that if the allegations are sustained by the proof (this case being upon demurrer,) or admitted by the defendants, the complainants are entitled to relief, and the decree sustaining the demurrer and dismissing the bill, should be reversed, and the case remanded for further proceedings in conformity to this opinion.

*Decree reversed, and
case remanded.*