Merrimack,
June 7, 1949. } No. 3802.

RALPH L. DODGE, *Adm'r w. w. a.*

*v.*

NEW HAMPSHIRE CENTENNIAL HOME FOR THE AGED.

474

*Robert W. Upton* (by brief and orally), for the plaintiff.

*H. Thornton Lorimer* and *Thomas F. Donovan* (*Mr. Donovan* orally), for the defendant.

JOHNSTON, J. The position of the plaintiff is stated as follows: "She [Miss Johnson] offered to pay the required deposit of $400 and to give all her property to the defendant in consideration of her admission to the Home as a member for life. . . . The plaintiff's offer or proposal to become a member could not become binding until her conditions were met by unconditional acceptance by defendant. Her death would terminate the offer unless previously accepted in accordance with its terms."

The defendant claims that a completed contract existed between it and the deceased subject to termination only in the event of her death or the dissatisfaction of either party during the probationary period. It argues further that in accordance with the terms of the contract title to the fee and the property had passed and that nothing under said terms occurred to cause defeasance of the title. It does not deny that, if a member leaves during the probationary period, the admission fee less a reasonable charge for board shall be returned together with the property transferred to the home.

When Miss Johnson entered the home October 29, 1943, nothing further needed to be stated concerning the terms of her admission. Regardless of whether the certificate of permanent admission would have indicated the beginning of a new contract or merely that the previous agreement had not terminated, she was a member during the probationary period under the executed contract that can be determined from the exhibits.

There is no express provision in the contract of membership concerning the effect of a member's death on the title to the admission fee and the property transferred.

The bond provided that Miss Johnson should transfer and convey to the home all her property on her admission. It is reasonably clear that by "admission" was meant the first entry as an inmate even if the admission was on probation only. The bond recited that it was "to be signed by each inmate upon entering the Home." The certificate given Miss Johnson as probationer stated that she had been "admitted" to membership. The terms of "admission" apply both to probationers and to permanent members. They required that four hundred dollars be furnished before any one is "admitted." Also that when the trustees have voted to "admit" a person to the home, a certificate should be issued stating the "admission" to be on probation.

When "permanent member" is meant in the exhibits, care is taken to use those words. If the property was to be transferred to the home only on admission as a member for life, it would have been simple to have stated that that should be the time of transfer or the consideration for the transfer.

The parties themselves to the contract of support construed it to mean that the savings accounts should be transferred when Miss Johnson was admitted in the first instance. Under the so-called bond executed October 29, 1943, the bank deposits were transferred to the defendant.

Title passed to the defendant on the execution of the bond and the delivery of the books of deposit. Then Miss Johnson intended to transfer and make delivery subject only to the condition of dissatisfaction of either party during the term of probation and then the home accepted the books of deposit. See *Dover &c. Bank* v. *Tobin*, 86 N. H. 209, 210. Since the contract has no provision for defeasance of the title to the funds and the bank deposits on the death of Miss Johnson, they remain the property of the defendant.

This contract is not unconscionable. "Vulgarly speaking, the home and the inmate each took a chance, and in this instance the home won. But suggestion of the spirit of gamble is unfair and offends good taste, for the home is a pure charity for the aged homeless, supported by public contributions, and unselfishly served by kindly and generous men and women. Mrs. Schuman had a fondness for the home before she sought its shelter, and gladly contributed what little she had and offered more and all, if more should come to her by any possibility, to help other unfortunates of this noble institution. The defense of public policy, in the circumstances, is an intrusion. The policy that dictates that no man shall pauperize himself and become a charge on the public also conversely teaches that charitable institutions which tend to save the public of such charges are to be encouraged." *Fidelity Union Trust Co.* v. *Reeves*, 96 N. J. Eq. 490, 494, 495. The inmate had fallen heir to $30,000 a few days before her death, and the right of the home to this as after-acquired property was upheld. Other cases sustaining similar contracts are: *Nicolaysen* v. *Pacific Home*, 65 Cal. A. (2d) 769; *Sisters of St. Francis* v. *Guillaume Estate*, 222 Ill. App. 543; *Hornstrom* v. *Beverly State Sav. Bank*, 304 Ill. App. 574; *The Maccabees* v. *Stone*, 306 Ill. App. 468; *Stoddard* v. *Gabriel*, 234 Iowa 1366; *Jernberg* v. *Evangelical Lutheran Home for the Aged*, 156 Kan. 167; *German Aged &c. Home* v. *Hammerbacker*, 64 Md. 595; *In re Heim's Estate*, 8 N. Y. S. (2d) 574. It is said that the above cases are ones in which the agreement to support is absolute and in which there is no provision for a probationary term. However, the fact that the trustees of the home because of dissatisfaction at the end of the trial period may remove the inmate returning her property and admission fee except for a reasonable charge for board does not render the contract unfair.

The terms of admission as given on the reverse side of Miss Johnson's application stated with respect to the period of probation of six months that "in case of dissatisfaction on either side, the arrangement can be terminated and board charged at the rate of $4 per week."

This is construed to mean that after charges the inmate should be placed in her original position with her property and any balance of the admission fee returned. But regardless of the wording of the contract between the deceased and the home, an agreement would have been implied that under these circumstances the property of the deceased would have been returned to her. "We construe the contract to intend a return of all the money or property previously transferred, less the five dollars per week for the period of care. It speaks only of a return of an admission fee upon termination, but it seems too unreasonable to suppose that the officials of the Home intended the termination to let an inmate go within the six months deprived of all resources. Termination we take to mean rescission, to that extent, at least." *Aged Men's Home* v. *Marley*, 156 Md. 478, 481.

The same weighty reasons do not exist for implying either in fact or quasi-contractually an agreement to return the property in case of the inmate's death as in the event of her withdrawal from the institution. In the latter situation the inmate requires her property for the necessities of her continued existence. In the former, the issue is between the charitable institution and the estate of the former inmate, between one who would use the property for caring for others situated as Miss Johnson was or worse off financially and a legatee or legatees whose only interest, so far as the record shows, is to receive their gifts. Moreover, the fact that provision is made for returning the property in certain instances indicates an intention that it should not be given back in any other circumstances.

No court of last resort has decided that there should be a return of the property if an inmate dies during a probationary term. The plaintiff does cite three opinions of two intermediate courts, which so hold. The case of *Evangelical &c. Congregation* v. *Bishop*, 213 Ill. App. 137, made no distinction between a withdrawal by an inmate during the trial period and her decease and decided that it was the intention that in either event the home must return the property. This case was cited in *Christenson* v. *Board of Charities*, 253 Ill. App. 380, which reached a similar result and decided "in equity and good conscience" that the sum of $2,200 could not be retained by the home in view of the short period of time before the inmate's death. In *Kirkpatrick Home* v. *Kenyon*, 196 N. Y. S. 250, the rules provided: "If for any reason an inmate leaves or is dismissed by the board of directors during that period, the sum of $10 per week for board will be deducted from the entrance fee, and the remainder returned."

The court said: "Whether decedent would become liable to pay $5,000 [the entrance fee] could only be determined by the exercise of her volition or will at any time during the two months not to leave the home." Because of the death of the inmate during the trial period, it was held that she could not elect to remain in the home and therefore the latter was not entitled to recover the entrance fee. No one of these three cases distinguishes between the legal effect of a withdrawal and that of the decease of an inmate.

It is not inequitable for a charitable home for the aged to retain property of an inmate who dies during a probationary term, when said property has been transferred to it in fee without stipulation for defeasance of title in the event of such decease.

*Bill dismissed.*

BRANCH, C. J., and DUNCAN, J., dissented: the others concurred.

BRANCH, C. J., and DUNCAN, J., *dissenting:* By her application for admission to the defendant home, the decedent sought permanent membership in the home, and the "privileges . . . for life" to which such membership would entitle her. It is impossible to read the documents in this case without coming to the conclusion that the contract between the parties was not complete. Final action by the defendant upon the decedent's application was contemplated but never taken. She was granted tentative admission for a six month probationary period only, at a fixed weekly rate. Since she was never confirmed as a permanent member and the defendant never obligated itself to support her for life, the contract upon which the transfer of her property was intended to become absolute was never made.