**LERMAN et al. v. FRUIT PROC-
ESSORS, Inc.**
No. 10737.

United States Court of Appeals
District of Columbia Circuit.

Argued Dec. 12, 1950.

Decided June 28, 1951.
Writ of Certiorari Denied Nov. 13, 1951.
See 72 S.Ct. 168.

Robert L. Wright, Washington, D. C., with whom Carl W. Berueffy, Washington, D. C., was on the brief, for appellants. Martin W. Bell, Melville Ehrlich and Hyman Smollar, Washington, D. C., also entered appearances for appellants.

Leslie C. Garnett, Washington, D. C., with whom Samuel F. Beach, Washington, D. C., was on the brief, for appellee.

Before WILBUR K. MILLER and WASHINGTON, Circuit Judges, and KIMBROUGH STONE, Circuit Judge, retired (sitting by designation).

STONE, Circuit Judge.

This is an appeal from a judgment upholding a reparation order under the Perishable Agricultural Commodities Act, 1930, 7 U.S.C.A. § 499a et seq. Appellants are copartners dealing in frozen fruits and vegetables in the District of Columbia. Appellee is a corporation engaged in processing frozen fruits at St. Joseph, Michigan. This controversy involves red raspberries which appellants refused to receive and pay for.

Although given proper notice, appellants made no appearance in the reparation proceeding until after a default award to appellee. Out of time thereafter, appellants filed a petition asking that the default be set aside; that they be permitted to answer the complaint; and that an oral hearing on the fact issues be granted. This petition was denied.

Thereafter, appellants filed a petition for review[1] stating their grounds therefor to be (a) that they never entered into any contract for the purchase "of any specified quantity of red raspberries as claimed"; (b) that the raspberries tendered were in a warehouse in Chicago and appellants were denied inspection "for quality", wherefore appellants refused to purchase; and (c) complainant did not act reasonably to mitigate damages.

In the pre-trial proceedings, the position of appellants is stated as follows:

"1. Petitioners did not violate the Act and are not guilty of unfair practices because there was no contract to buy any specific amount of frozen fruit and because the contract was subject to approval as to price, which price was not fixed by reason of appellees not permitting inspection.

"2. In the alternative, petitioners maintain the contract as required to be in writing under Statute of Frauds.

"3. That appellee's refusal to permit inspection of products constituted reasonable cause for petitioners not accepting merchandise.

"4. That appellee, having claimed breach of contract in Aug. 1946, did not sell products within reasonable time and, therefore, failed in their legal obligation to mitigate damages."

Each of these propositions was countered by appellee.

Just before introduction of evidence in the District Court, appellants asked leave to file an answer "as tendered to the Secretary of Agriculture". The Court denied the request stating "the Court will regard the position of the complainant here as including an implied general denial. The Court is doing that in part because the proposed answer now does present an affirmative defense."

The result of these successive attempts at pleadings is that the issues are such as presented by the complaint and a general denial thereof. The issue of the Statute of Frauds was thus expressly eliminated by

1. 7 U.S.C.A. § 499 g(c).

the trial court, without objection by appellants. They do not present that issue here.

The matters argued here by appellants are (1) they never made the contract sued upon; (2) appellee never made the deliveries called for by the alleged contract; (3) right of inspection of the berries was denied appellants; and (4) there was no proper mitigation of damages.

### 1. The Contract.

The evidence favorable to appellee establishes the following. In 1946, appellants were desirous of securing frozen fresh cherries and raspberries—particularly the latter. For several years prior to this, they had purchased stock from or through W. J. A. Dietrich, who was a broker of dried and frozen foods at Baltimore. Late in June, 1946, appellants made known to Dietrich their wants. Early in July, Dietrich sent Beasley, one of his salesmen, to Michigan in quest of berries and cherries for appellants and for other of the patrons of Dietrich. After contacting Mr. Elder (general manager of appellee) at St. Joseph, Michigan, Beasley telephoned to Harry Lerman, an appellant, from the office of Elder. In this one conversation, Beasley arranged for the purchase by appellants of 600 cans (30#) of frozen red raspberries, 1500 cases of 2# packages of frozen red raspberries (36,000#) and 1500 cases of 16 oz. packages of frozen red raspberries (36,000#), all at stated prices. Beasley telephoned these arrangements to the office of Dietrich in Baltimore and they were there entered on order confirmation forms by Dietrich or his secretary—and copies sent to appellants and to appellee.

The canned fruit was in a Chicago warehouse at the time of purchase; was shipped from there to appellants; accepted by them and paid for. The controversy here is as to the one and two-pound packages.

The complaint before the Secretary stated it was based on a written contract. This was "Exhibit 1", attached thereto, which was alleged to be "the original purchase order dated July 5, 1946, signed by R. Miller for W. J. A. Dietrich Company." This exhibit is as follows.

"W. J. A. DIETRICH Co.
Bulk, Institutional and Consumer Packages
  Tower Bldg., Baltimore St. & Guilford Ave.
    Baltimore 2, Maryland

For Account of: FRUIT PROCESSORS, INC.

Sold to: Lerman Brothers,
    4th St. & Va. Ave.
    Washington 4, D. C.

TERMS: S/D Thru: American Security & Trust Co.
    7th & E. Sts., S. W.,
    Washington 4, D. C.

Remarks: F. O. B. Michigan
    No. 114
    Date: 7/5/46

| Quantity | Size | Brand and Commodity—Price Per | | | |
|----------|------|-------------------------------|---|---|---|
| 1500 Cases | 12/2# | Frozen Red Raspberries | 5x1 | .40 | lb. |
| 1500 Cases | 24/16 oz. | "       "       " | " S.A.P. | 40¢ |
| 600 | 30# | Tins Frozen Red Raspberries | 35¢ | | |
| | | FOB Chicago | | | |

SALES MEMORANDUM

Subject to confirmation of seller. This memo becomes void when sale is covered by contract. If incorrect advise immediately.

W. J. A. DIETRICH COMPANY
per s/ R. MILLER"

At pre-trial it was stated that "By agreement of counsel for the respective parties, present in Court, it is ordered that the subsequent course of this action shall be governed by the following stipulations unless modified by the Court to prevent manifest injustice:"

One of these stipulations was "Parties stipulate that there is no written agreement in this case, except the Brokers' Memorandum, already introduced in the record before the Secretary of Agriculture."

If this stipulation is binding, the attack upon the contract is foreclosed thereby because the "Brokers' Memorandum" introduced before the Secretary was "Exhibit 1". If this stipulation is not binding, we must determine, from the evidence, what were the essentials of any written contract between the parties concerning this transaction.

On trial in the District Court Elder testified that he received Exhibit 1 "as *two* papers" (italics added). He identified these two papers ("Lerman Exhibit 1" and "Lerman Exhibit 2") which were as follows.

"*Lerman Ex. 1 for Identification*
W. J. A. DIETRICH Co.
Bulk, Institutional & Consumer Packages
Dried and Frozen Foods
Tower Bldg., Baltimore St. & Guilford Ave.
Baltimore 2, Maryland

Lexington 1634–35
T. W. X. BA 576
"Sold to: Lerman Brothers
    4th St. & Va. Ave.
    Washington 4, D. C.

Remarks:
For account of: FRUIT PROCESSORS INC.
Terms: S/D thru: American Security & Trust Co.
    7th & E Sts., S. W.,
    Washington 4, D. C.
F. O. B. Michigan
No. 114
Date: 7/5/46

| Quantity | Size | Brand and Commodity | | Price Per | |
|---|---|---|---|---|---|
| 1500 Cases | 12/2# | Frozen Red Raspberries | 5x1 | .40 | lb. |
| 1500 Cases | 24/16 oz. | " " " | " | S.A.P. | 40¢ |

SALES MEMORANDUM

Subject to confirmation of seller. This memo becomes void when sale is covered by contract. If incorrect advise immediately.

W. J. A. Dietrich Company
per /s/ W. J. A. D.

*Lerman Ex. 2 for Identification*
W. J. A. DIETRICH Co.
Bulk, Institutional & Consumer Packages
Dried and Frozen Foods
Tower Bldg., Baltimore St. & Guilford Ave.
Baltimore 2, Maryland

Lexington 1634–35
T. W. X. BA 576
Sold to    Lerman Brothers
           4th St. & Va. Ave.
           Washington 4, D. C.

Remarks: Fruit Processors will draw draft and transfer to Lerman in warehouse at Chicago. Stock will be ordered out at a later dated (sic) by WJADietrich Co. for customer, as soon as customer turns over to WJADietrich Co. delivery order.

For account of: FRUIT PROCESSORS INC.
Terms: S/D thru: American Security & Trust Co.
                 7th & E Sts., S. W.,
                 Washington 4, D. C.

F. O. B. Chicago Warehouse, packer to pay 1st month's storage.
No. 156
Date: 7/11/46

| Quantity | Size | Brand and Commodity | Price Per | | |
|---|---|---|---|---|---|
| 600 Cans | 30# | Frozen Red Raspberries | 5x1 | .35 | lb. |

## SALES MEMORANDUM

Subject to confirmation of seller. This memo becomes void when sale is covered by contract. If incorrect advise immediately.

W. J. A. Dietrich Company
per /s/ W. J. A. D."

The evidence is clear that the sale of these three different packs (30# cans, 2 pound and 3 pound packages) of raspberries and of a shipment of cherries were all parts of one transaction. That transaction was the one telephone conversation between Beasley, at St. Joseph, Michigan, and Harry Lerman, at Washington City. The results of that conversation were telephoned by Beasley to the home office of Dietrich, in Baltimore, and there entered on confirmation orders.

In such transactions, it was not unusual for more than one such order to be issued covering different items of a single transaction. Where this was done, it was merely "so that when it comes to files, and there is correspondence on that particular item, other items don't have to be held as back orders." Usually where this is done, three copies of the orders were made by the broker, who retained one and sent another to each of the parties.

As to the cherries, that procedure was followed. As to the raspberries, it was followed to the extent that the canned berries were included in one order and the packaged berries in another—this is conceded by Elder. How "Exhibit 1" came into being is not explained in the evidence. However, it is not determinative here that "Exhibit 1" was not the exact copy of the paper delivered to both parties. Our concern is whether "Exhibit 1" sets forth the elements of that portion of the contract here involved, to wit, the packaged berries—such being the only part of the entire transaction which has not been fully performed by both parties.

In examining this matter, we are primarily interested in a comparison of the provisions of "Exhibit 1" with those of "Lerman Exhibit 1". Such comparison results in but one seeming uncertainty and one definite difference. The uncertainty arises from the expressions, in "Exhibit 1", of "F.O.B. Michigan" and "F.O.B. Chicago" as compared with "F.O.B. Michigan", in "Lerman Exhibit 1". This uncertainty readily disappears when "Lerman Exhibit

2" is considered in connection with the "30# Tins" item on "Exhibit 1". Clearly, the "F.O.B. Chicago" expression refers to that item—leaving delivery of the packaged berries as "F.O.B. Michigan" in both exhibits "1".

The definite difference is that in "Exhibit 1" a price of ".40 per lb." appears for the one-pound packages while the corresponding space in "Lerman Exhibit 1" contains "S.A.P.", meaning "subject to approval [of buyer] as to price". This trade expression does not mean that this price was to be fixed by the buyer. Rather, it means that a price suggested by the seller is to be approved by the buyer.

In the telephone conversation between Beasley and Harry Lerman, at the time this entire transaction was arranged, the price of forty cents was quoted to Lerman. Both Beasley and Elder (who heard what Beasley said in that conversation) deemed this price was agreed. However much Beasley and Elder might have thought the price was settled in that conversation, it was not carried into the written confirmation order. Therefore, that price was not approved *at the time* the written contract was executed. By its terms—"S.A.P."—that contract contemplated a price approval by the buyer thereafter. Had there been no subsequent approval by the buyer, there would have been no contract binding upon the buyer as to these one-pound packages.[2]

We think there was such subsequent approval. The contract provided for no special form of approval. Any expression or *act* by appellants manifesting such approval would be sufficient.[3] There was no verbal or written expressed approval here. Approval is found in acts of appellants.

When this sale was made, there was a strong seller's market for berries. The only price ever quoted by appellee or mentioned in this entire transaction was that of forty cents. Packing in one-pound containers was a special packaging outside of appellee's regular packs. It had no one-pound containers. With this knowledge, appellants sent to appellee forty thousand one-pound containers. These were paper cups. The usual pound containers were flat "Marathon" boxes. Cups were objectionable for several reasons—they leaked, did not stack well in boxes and took up too much space. Also, appellants sent a rubber stamp containing the brand "Lerman's Frostee Brand" which was to be stamped on each cup—also on the 2# packages. The foregoing procedure was followed by appellee in packing and stamping these containers. The value of this pack at forty cents was the subject of the sight draft on appellants dated July 25th. Thereafter, repeated requests were made for payment of this and two earlier drafts and repeatedly appellants promised to pay the drafts, giving as reason for delay that they were temporarily short of funds. However, no payment was made. On August 6, appellants demanded inspection which was refused by appellee the following day in a telegram stating that, unless the drafts were paid by August 8, appellee would withdraw them and sell the berries holding appellants for any loss. It was not until the pre-trial proceedings—twenty months after the order of reparation—that appellants ever questioned this provision of the contract.

The foregoing recital of facts reveals clearly an approval of this price of forty cents for the one-pound packs both by the affirmative acts and by the negative acts of appellants. The affirmative acts were sending the one-pound cups and the brand stamp for use thereon. It would be absurd to conclude that either party would have gone forward with this packing in special containers with appellants' brand stamped thereon while the price of this perishable product was undetermined. The negative acts which emphasize the agreement on this price are those involving the failure and delay in suggesting lack of price.

Therefore, whether reliance be placed upon the pre-trial stipulation or upon the evidence as to the transaction and the subsequent conduct of appellants, "Exhibit 1"

2. Brooks v. Federal Surety Co., 58 App. D.C. 56, 24 F.2d 884; Taller & Cooper v. Illuminating Electric Co., 7 Cir., 172 F.2d 625, 626.

3. Larabee Flour Mills Co. v. Carignano, 10 Cir., 49 F.2d 151, 152.

did set forth the essentials of the contract as to the berries involved in this suit.

## 2. The Deliveries.

Appellants challenge performance of the contract on the part of appellee by attacking the tendered deliveries as not in accord with the contract. They contend that the proferred delivery was "for different quantities at different prices with a different delivery point".

*The quantities.* The contract was for 36,000# of berries in 2# containers and for 36,000# in 16 oz. containers. The deliveries tendered by the warehouse receipts were 40,832# in 2# containers and 17,-232# in 16 oz. containers.

*As to price.* The evidence shows, that as to the 2# packs, appellee made a voluntary concession, *after* the contract had been made, of a cent a pound, so that the price of those packages became thirty-nine instead of forty cents a pound. The drafts sent on July 10 and July 12 were for the 40,832# of the 2# packs at thirty-nine cents. The draft sent on July 25 was for 17,232# of the 16 oz. pack at forty cents.

*The point of delivery.* The contract called for delivery "F.O.B. Michigan". Delivery was tendered by warehouse receipts of a Chicago warehouse, attached to these three drafts.

Thus it appears (1) that the quantities tendered for delivery differed from the contract; (2) that the contract prices (as modified by the above one cent per pound concession) were complied with; and (3) that the point of delivery differed from the contract.

As to both quantities and point of delivery, neither was given by appellants as a reason for repudiation of the contract until after the reparation proceedings before the Secretary, which was months after appellee had reclaimed and disposed of these berries. The sole reason originally alleged was denial of inspection of these berries. As to the "quantities", had such an objection been made before the drafts were withdrawn appellee could have easily re-duced the number of the 2# packages to the 36,000# called for by the contract. There is no evidence that appellee could not have increased the 16 oz. packages to the contract level. As to the point of delivery, the inspection sought by appellants was, *as requested by them,* to be in the warehouse at Chicago. In this situation and where appellants relied upon the one ground of refusal of inspection they cannot come forward, at this late day, with other grounds for repudiation. Thereby appellants waived their rights to base non-performance upon departures from the contract as to quantities and as to point of delivery.[4]

## 3. The Inspection.

The trial court found that the contract did not provide for inspection; but, if there existed a right of inspection, it was lost because not exercised within a reasonable time "which the regulations of the Secretary provide is six hours after delivery by truck". It is unnecessary to determine the existence *vel non* of such right. If it existed, the trial court found correctly that it was lost—waived—by failure to demand the inspection within a reasonable time.

The Regulation of the Secretary (Regulation 46.2(r) ) fixing "reasonable time" "at not to exceed six hours after receipt of notice of arrival of the produce" is challenged as not applicable to the situation here. If the Regulation is applicable, there can be no doubt that the demand for inspection was too late, since it came a week after notice that the last of the berries were in the warehouse. However, there is no need to determine whether the Regulation is applicable. If there had been no Regulation defining a reasonable time for demanding inspection or for rejection of the berries because of denial of inspection, yet the result here would be the same. The general rule of law as to sales is that, unless a period of inspection is provided in the contract, inspection must be made within a "reasonable time" (Reading Steel Casting Co. v. United States, 268 U.S. 186, 188, 45 S.Ct. 469, 69 L.Ed. 907; 46 Am.Jur. p. 431,

---

4. Hill v. Fruita Mercantile Co., 42 Colo. 491, 94 P. 354, 356; Meincke v. Falk, 61 Wis. 623, 21 N.W. 785; 46 Am.Jur. p. 392, § 210; 12 Am.Jur. p. 918, § 354.

§ 250). When not fixed by statute or other lawful regulation, a reasonable time is a matter of fact measured by the circumstances of each situation. Here, the pertinent circumstances are as follows.

■ The drafts went forward on July 10, July 12 and July 25. Each was accompanied by a Chicago warehouse receipt representing the berries covered by the particular draft. Inspection (at the warehouse) was demanded by appellants on August 6. The warehouse refused unless authorized by appellee, to which the outstanding receipts had been issued. Dietrich telephoned this demand to appellee on August 6. Appellee refused on August 7 by telegram to appellants. About three days were normal for receipt of a draft from St. Joseph to appellants' bank at Washington. Appellants were notified by their bank of receipt of the drafts. Several times, both Dietrich and Beasley each requested appellants to pay the drafts. On July 22—ten days after transmission of the second draft —appellee telegraphed Dietrich to telegraph it why these two drafts had not been paid.[5] Dietrich replied the next day that the draft for the cherries was paid "other being paid tomorrow." They were told appellants were a little pressed for money but the drafts would be picked up in a day or so. There was never any request for an inspection in connection with these conversations about payment of the drafts.

In view of the above outlined situation, the trial court could not fail to determine that appellants had not exercised, within a reasonable time, any right of inspection they may have had, whether measured by the Regulation or not.

In this connection, the attitude of appellants may be explained by the facts that during July there was a seller's market in raspberries but this market broke shortly before the demand for inspection.[6]

#### 4. Mitigation of Damages.

■ The Perishable Agricultural Commodities Act contains no provision governing mitigation of damages. The general rule is that "the seller must minimize or keep down his damages so far as it is reasonably within his power to do so" (46 Am. Jur. p. 769, § 639). The burden is upon the buyer to show that the seller did not reasonably minimize the loss caused by the buyer.[7]

With these rules in mind, we turn to the evidence to ascertain whether appellants have successfully carried this burden.

■ Payment of the drafts was refused finally on August 8, 1946. The first attempt by appellee to sell these berries covered by the drafts was on August 10 or 11. At that time, the market was "very much confused." Appellee asked its brokers "throughout the country to sell them." It contacted its "big customers." Dietrich and Beasley sold some of them for appellee but were unable to sell more. Appellee tried in August, 1946, to sell them for 40 cents and later in that month and thereafter offered them for less—"for 35 and for 30 and for 25, and then 20, as the time progressed." A few were sold in November, 1946, for 39 cents. Some of the brokers took out samples to display. The containers of these berries were stamped with appellants' brand name. The 16 oz. cups were particularly undesirable "and when the markets were breaking, then that stuff became a drug on the market and was very, very hard to move because of the type container it was in" (testimony of Dietrich). Twenty-four hundred pounds (16 oz. pack) were sold in November, 1946, for 38 cents a pound. Three hundred thirty-eight pounds (2# pack) in the same month for 39 cents. Sixty-four pounds (2# pack) in March and 96 pounds in May, 1947, at 33 cents. Six thousand pounds (16 oz. pack) in July, 1947, for 17 cents. Two hundred eighty-eight pounds

---

5. This telegram inquiry included also another draft for the cherries.

6. Compare situation in California Prune and Apricot Growers, Inc., v. Wood & Selick, Inc., D.C.N.Y., 2 F.2d 88.

7. Buchman v. Millville Mfg. Co., 2 Cir., 17 F.2d 983, 986; 108 A.L.R. note p. 1503; Restat. Contracts, p. 541, § 336 ("Comment on subsection (2)").

(16 oz. pack) in July, 1947, for 15 cents. And on August 5, 1947, 40,114 pounds (2# pack) and 8,432 pounds (16 oz. pack) for 15 cents. In addition, appellee charged itself with 301 pounds of both packs at 20 cents which were "used by various brokers in the sales of same".

From the above outline of the evidence, it is clear that appellants are far from proving any lack of reasonable efforts by appellee to mitigate damages. To the contrary, it seems evident that appellee did all that it reasonably could to dispose of difficult articles in a confused and depressed market situation.

The judgment is affirmed.