400 F.2d 112
 Adrien MIRON and Raymond Miron, Gilbert Miron, Vincent Miron and Adrien Miron as Executors of the Estate of Gerard Miron, Plaintiffs-Appellees,
v.
YONKERS RACEWAY, INC. and Saul Finkelstein, Defendants-Appellants.
 No. 486.
 Docket 32158.
 United States Court of Appeals Second Circuit.
 Argued May 8, 1968.
 Decided August 12, 1968.
 
 Adlai S. Hardin, Jr., New York City (Edward J. Reilly, Jr., and Milbank, Tweed, Hadley & McCloy, New York City, on the brief), for plaintiffs-appellees.
 Arthur P. West, White Plains, N. Y. (Bleakley, Platt, Schmidt, Hart & Fritz, White Plains, N. Y., on the brief), for defendant-appellant Yonkers Raceway, Inc.
 Jesse Moss, New York City (Sue Caplan, New York City, on the brief), for defendant-appellant Saul Finkelstein.
 Before LUMBARD, Chief Judge and SMITH and ANDERSON, Circuit Judges.
 J. JOSEPH SMITH, Circuit Judge:
 
 
 1
 Yonkers Raceway, Inc. and Saul Finkelstein appeal from a judgment of the District Court for the Southern District of New York, Richard H. Levet, Judge, entered after a trial without a jury, rendering them liable to plaintiffs for the purchase price of a horse and dismissing their counterclaims on the merits. The horse was sold to Finkelstein under a warranty that it was sound, but on the day after the sale it was found to have a fractured bone in its leg, and Finkelstein demanded that the plaintiffs take it back. They refused to do so, and eventually sued the Raceway and Finkelstein for the purchase price in the District Court, jurisdiction being based upon diversity of citizenship, and New York law governing. Finkelstein counterclaimed for the expense of maintaining and caring for the horse. The Raceway, a defendant by reason of having been the plaintiffs' agent for the sale of the horse at public auction, counterclaimed for its commission, attorneys' fees, and expenses, and entered a cross-claim against Finkelstein. Judge Levet held that Finkelstein had accepted the horse and therefore bore the burden of proving a breach of warranty, and found that Finkelstein had failed to prove by a fair preponderance of the credible evidence that the horse was not sound at the time of sale. He also held that Raceway had breached its contract with the plaintiffs by delivering the horse to Finkelstein before payment of the purchase price and was thus not entitled to its commission, and that there was no basis for awarding Raceway its attorneys' fees. On the cross-claim, Finkelstein was held liable to Raceway to the extent that Raceway is liable to the plaintiffs. Jurisdiction was retained so that the court could entertain, if necessary, a suitable application from Raceway for judgment against Finkelstein on account of contributions by Raceway toward payment of any part of the plaintiffs' judgment; and upon a finding of no just reason for delay, judgment was entered for plaintiffs. We affirm.
 
 I.
 
 2
 In September 1965, plaintiffs[1] entered the horse "Red Carpet" in an auction called the "Old Glory Horse Sale," sponsored by Raceway. The contract by which Red Carpet was consigned to Raceway for sale provided that Raceway would act as plaintiffs' exclusive agent for the sale of the horse and would receive a commission of 10% on the accepted bid, and incorporated by reference the "Terms and Conditions of Sale." The Terms and Conditions of Sale provided, inter alia: that the horses were offered for sale according to the laws of New York, that title and "all risk and responsibility for the horse" pass to the buyer at the fall of the auctioneer's hammer, that "No delivery will be made until final settlement," and that "unless otherwise expressly announced at time of sale, there is no guarantee of any kind as to the soundness or condition or other quality of any horse sold in this Sale except that horses which are unsound in eyes or wind, or are `cribbers,' must be announced at time of sale * * * Any horse whose condition is as aforesaid and is not so announced at time of sale, or where sex is incorrectly represented at time of sale, will be subject to return to Consignor * * * [provided that the buyer gives notice in writing] within seven days of sale. Any other representation, warranty or guarantee of the Consignor which is announced or otherwise given shall not extend beyond 24 hours after the fall of the Auctioneer's hammer or until final payment has been made, whichever is sooner."
 
 
 3
 Plaintiffs delivered Red Carpet to Raceway on October 17, 1965; the auction of the horse took place early in the afternoon of October 19. At $17,000 there was a lull in the bidding, whereupon Murray Brown, plaintiffs' employee, took the microphone and said:
 
 
 4
 This horse has won 2 of his last 3 starts. On September 24, he raced on a muddy track, big stake race in Montreal * * * beating Mr. Sea Song. Now, you know what Mr. Sea Song has done this year * * * he's a top free-for-all horse and this horse beat him racing a good trip, and this is just recently. He's as sound — as, as gutty a horse as you want to find anywhere. He'll race a good mile for you every time. He's got loads of heart and you're way off on the price of this horse.[2]
 
 
 5
 The bidding then resumed, and defendant Finkelstein submitted the highest bid, which was $32,000.
 
 
 6
 By about 3:00 p. m. that day, Raceway delivered possession of Red Carpet to Finkelstein without obtaining any part of the purchase price, and Finkelstein immediately had the horse transported to his barn at Roosevelt Raceway, Westbury, Long Island. The next morning, Cruise, the trainer for Finkelstein's horses, took Red Carpet out of his stall and hitched him to a jog cart. He observed some swelling of the horse's left hind leg at that time, and when the horse was caused to walk and trot, it limped and favored its left hind leg. Cruise returned Red Carpet to the stall, and summoned Dr. Bernard F. Brennan, a veterinarian, who found that Red Carpet's left hind leg was swollen, warm and sensitive.
 
 
 7
 Finkelstein notified Raceway, at about 11:30 a. m. that day, October 20, that Red Carpet was lame and not sound, and that afternoon an official of Raceway notified Brown, at plaintiffs' stables, of Finkelstein's complaint. Finkelstein subsequently demanded, as we have said, that plaintiffs take back the horse because it was not sound, as warranted, but they have continued to refuse to accept its return. Neither Raceway nor Finkelstein has paid plaintiffs any part of the purchase price for Red Carpet.
 
 
 8
 The basic factual issue tried below was whether Red Carpet was sound, as warranted, at the time when the auctioneer's hammer fell and all risks passed to Finkelstein as the buyer. The defendants' evidence on this issue consisted of X-rays of the horse's left hind leg.
 
 
 9
 Dr. Brennan testified that he took X-rays of Red Carpet's leg on the afternoon of October 20, and prints were introduced as the defendants' Exhibits B, C, D1 and E1. The X-rays revealed a broken splint bone, which, it was agreed by witnesses for all of the parties, is enough to render a racehorse unsound.[3] Both of the defendants' expert witnesses, Dr. Brennan and Dr. Charles F. Reid, testified that Exhibits B and D1 revealed calcification around the site of the fracture indicating that the fracture was two or three weeks old. The plaintiffs' experts testified, however, that Exhibit D1, unlike Exhibit B, did not show calcification, and concluded that the X-rays must have been taken on different days. The defendants countered by offering testimony that a difference in intensity between the exhibits explained the fact that callus growth was less visible on D1 than on B, but the court found that Exhibit D1 showed no calcification and that it therefore was not taken on the same day as Exhibit B. The court also found that Exhibits D1 and E1 were undated, that Exhibits B and C were admittedly incorrectly dated, and that no business records sufficient to prove the date on which the X-rays were taken had been produced, and concluded that the exhibits lacked sufficient probative force to establish the date on which the fracture occurred.[4] We see no reason why this conclusion should not stand.
 
 
 10
 The expert witnesses were in substantial agreement that the symptoms of a broken splint bone are swelling, heat which is perceptible to the touch, and sensitivity and lameness, and that these symptoms become apparent immediately or very soon after the occurrence of the fracture. Thus if Red Carpet's splint bone was broken at the time of sale, an examination of the horse after the sale would have disclosed that fact. Finkelstein testified that he was not an experienced horse buyer, and ordinarily has a trainer or veterinarian examine the legs of horses he buys, but he went to the auction on October 19, 1965 intending to buy two brood mares, and for that reason did not have his trainer or a veterinarian with him. Although he observed the horse when it was led into the ring at the auction, he did not examine it or look at its legs at the time of the sale. The court found that neither Finkelstein nor his agents inspected or examined the horse prior to the time when Cruise observed a swelling of its left hind leg on the day after the sale.
 
 
 11
 The plaintiffs offered, on the basic issue of the time of the fracture, testimony of persons who had observed and examined Red Carpet on the day of the sale. Roger White, a competitor of the Mirons, testified that he inspected the horse with the intention of buying it if the price was right, and that he couldn't see anything wrong with it. Dr. Rene Rosaire Gauthier, who accompanied White to the auction and examined Red Carpet for him, testified that when he examined Red Carpet's legs he observed no heat or swelling, and that he saw the horse trotting and walking without limping or manifesting any lameness. The court found, on the basis of this and other testimony, that "On October 19, 1965, prior to sale, the horse's left hind leg was neither swollen, hot, nor lame."[5]
 
 
 12
 The District Court's finding on the basic factual issue was expressed in terms of failure to carry the burden of proof. Concluding that under New York law Finkelstein had accepted Red Carpet and therefore had the burden of proving a breach of warranty, the court found: "Defendant Finkelstein has failed to prove by a fair preponderance of the credible evidence that the horse was not `sound' at the time of its sale to him on October 19, 1965."
 
 
 13
 We will first consider the questions relevant to whether there was a breach of warranty, and then turn to the issues raised by the counterclaims.[6]
 
 II.
 
 14
 We affirm the judgment below on the breach of warranty issue, because we agree with the District Court that under New York law Finkelstein had the burden of proving a breach of warranty and we find ample support in the record for the finding that Finkelstein did not carry that burden successfully. The plaintiffs have argued forcefully that we need not consider who had the burden of proof on the issue, but we must disagree.
 
 
 15
 The argument is that the District Court's subordinate findings of fact show that the holding in the plaintiffs' favor did not depend upon the conclusion that Finkelstein had the burden of proof, so that the only question we need answer is whether or not the finding that the horse was sound at the time of sale is clearly erroneous. If the facts had been found by a jury, we of course would be obligated to consider the correctness of the instructions on the burden of proof, for we would have to assume that those instructions influenced the verdict. But where the facts are found, as here, by the court, our position is very different. One of the reasons for requiring the trial court to "find the facts specially and state separately its conclusions of law thereon," Fed.R.Civ.P. 52(a), is to afford the appellate court a clear understanding of the basis of the trial court's decision. See, e. g., Leighton v. One William Street Fund, Inc., 343 F.2d 565, 567 (2 Cir. 1965). If the District Court's findings of fact and conclusions of law made it clear that the basic finding, in the judge's view, turned on who had the burden of proof, there would be no question but that his conclusion on that issue must be reviewed. If, instead, the findings and conclusions showed us that the judge considered the evidence to weigh sufficiently in the plaintiffs' favor so that the basic finding was independent of the conclusion that Finkelstein had the burden of proof, we could limit ourselves to a consideration of whether the finding was clearly erroneous, deeming it immaterial which party had the burden.[7] Fulton National Bank v. Tate, 363 F.2d 562, 566-567 (5 Cir. 1966). And we would so limit ourselves if we could, in order to avoid deciding a question of New York law which has not yet been passed upon by the New York courts.[8]
 
 
 16
 Our problem is that the District Court's findings and conclusions do not indicate explicitly that the judge would have found for the plaintiffs even if he had thought that they had the burden; the most we can say is that some of the subordinate findings of fact suggest that the outcome did not depend upon who had the burden.[9] Every reference to the primary factual issue in the opinion, findings and conclusions is in terms of whether Finkelstein had carried his burden of proof.[10][11][12]
 
 
 17
 Although we think it probable that plaintiffs would have prevailed below no matter who the judge thought had the burden of proof, nonetheless we would feel compelled to remand for new findings of fact were we to conclude that Finkelstein did not have the burden. We must state, then, why we agree with the District Court that he did.
 
 
 18
 The District Court based its determination that Finkelstein had the burden on New York Uniform Commercial Code ("U.C.C.") § 2-607(4), which provides: "The burden is on the buyer to establish any breach with respect to the goods accepted."[13] The question thus is whether Finkelstein accepted the horse, and we turn for guidance to U.C.C. § 2-606(1), which states:
 
 Acceptance of goods occurs when the buyer
 
 19
 (a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or
 
 
 20
 (b) fails to make an effective rejection (subsection (1) of Section 2-602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or
 
 
 21
 (c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.
 
 
 22
 It has not been argued that Finkelstein accepted the horse under subsection (a). We doubt he could be said to have done any act inconsistent with the plaintiffs' ownership of the horse, within the meaning of subsection (c), but we need not decide the applicability of that subsection, for we think the trial judge was right in finding that Finkelstein failed to make an effective rejection of the horse under U.C.C. § 2-602(1), thereby accepting it under subsection (b). U.C. C. § 2-602(1) provides: "Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller."
 
 
 23
 Finkelstein accepted the horse, then, if having had a reasonable opportunity to inspect it, he did not reject it within a reasonable time.[14] What is reasonable depends upon an evaluation of all of the circumstances, and we would therefore be reluctant to overturn the findings and conclusions of the trial judge on these issues. He has a feel for the circumstances of the case which we could not possibly have.[15] Moreover, the finding that Finkelstein did not reject the horse within a reasonable time[16] seems to us to be clearly correct.
 
 
 24
 As the trial judge rightly pointed out, "The fact that the subject matter of the sale in this case was a live animal * * * bears on what is a reasonable time to inspect and reject." Finkelstein's own testimony showed that it is customary, when buying a racehorse, to have a veterinarian or trainer examine the horse's legs, and we agree that the existence of this custom is very important in determining whether there was a reasonable opportunity to inspect the horse. See Official Comment to U.C.C. § 1-204, para. 2. We gather from the record that the reason it is customary to examine a racehorse's legs at the time of sale is that a splint bone is rather easily fractured (there was testimony that a fracture could result from the horse kicking itself), and although the judge made no specific findings as to this, we assume that is generally what he had in mind when he pointed out that "a live animal is more prone to rapid change in condition and to injury than is an inanimate object." As we have said, Finkelstein did not have the horse examined either at the place of sale or at his barn later the day of the sale. He thus passed up a reasonable opportunity to inspect Red Carpet.
 
 
 25
 Finkelstein having had a reasonable opportunity to inspect Red Carpet on the day of the sale, we have no problem with the finding that the attempted rejection on the next day did not come within a reasonable time. In addition to our reluctance to question the trial judge's finding as to what is a reasonable time, we take into account that what is a reasonable time for rejection depends on the purpose of rejection. See U.C.C. § 1-204(2). Where goods are effectively rejected for breach of warranty, the burden of proving that they conform presumably remains on the seller,[17] whereas upon acceptance the buyer has the burden to establish any breach. U.C.C. § 2-607(4). In this case, the subject of the sale is a racehorse warranted to be sound, and the record clearly shows that an injury such as occurred here, rendering a horse unsound, may be a matter of chance, proof of the exact time of injury being very difficult to make. In these circumstances, the burden of proof on the issue of soundness at the time of sale cannot fairly rest on the seller where the buyer has taken possession of the horse, transported it to his barn, and kept it overnight before discovering the injury and informing the seller of it. We conclude that rejection did not take place within a reasonable time after delivery, and Finkelstein thus accepted the horse. In short, since one of the consequences of acceptance is that the buyer bears the burden of proving any breach, the fairness of allocating the burden one way or the other is relevant in determining whether acceptance has occurred — here, whether rejection took place within a reasonable time.
 
 
 26
 The defendants have argued strenuously that inspection and rejection on the day after the sale is certainly soon enough, and the argument would gain substantial strength if another sort of defect were involved and we took into account that the customary type of inspection at the time of sale might not disclose aspects of a horse's soundness other than the condition of its legs, and that these aspects, unlike the condition of the legs, would be very unlikely to change overnight. There is nothing in the record as to how much the customary inspection at the time of sale would show; Finkelstein testified only that he has a trainer or veterinarian examine the legs of horses he buys. In any case, if there are defects which are not discoverable by the inspection which the District Court found Finkelstein had a reasonable opportunity to make, the problem is taken care of by U.C.C. § 2-608(1), which provides in relevant part:
 
 
 27
 The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it.
 
 
 28
 * * * * * *
 
 
 29
 (b) without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.
 
 
 30
 The answer to the argument is that inspection is not necessarily final; where there are defects discoverable by a customary inspection at the time of sale, a buyer in Finkelstein's position will not be excused from making that inspection and rejecting the goods within a reasonable time, if a defect is disclosed, on the ground that there are possible critical defects which only a more thorough inspection would disclose. There are no conceptual problems involved in this approach, for there is nothing ultimate about any of the conceptions we are using. Since a finding of acceptance depends upon a finding that there was a reasonable opportunity to inspect, the question whether acceptance may be revoked as reasonably induced by the difficulty of discovery before acceptance, within the meaning of U.C.C. § 2-608(1), must be answered by reference to the scope of the inspection which there was a reasonable opportunity to make. Thus if Finkelstein had carried out the customary inspection and accepted the horse, and the defect allegedly rendering Red Carpet unsound at the time of sale were a defect not discoverable by inspection on the day of sale, rather than a broken splint bone, we may presume the District Court would not have placed the burden of proof on Finkelstein, and would have said that he had "revoked his acceptance."
 
 
 31
 The defendants argue that the provision in the Terms and Conditions of Sale that any warranty of the consignor "shall not extend beyond 24 hours after the fall of the Auctioneer's hammer or until final payment has been made, whichever is sooner," fixes by agreement, a reasonable time for rejection, U.C.C. § 1-204(1), and that since Finkelstein rejected within 24 hours of the fall of the hammer, he did not accept Red Carpet under U.C. C. § 2-206(1) (b). There was considerable confusion over the meaning of this provision at the trial; Finkelstein submitted a memorandum in which it was argued that under the provision any defect violating the warranty appearing within 24 hours is presumed to be a defect existing at the time of sale, so that the seller must show that "some external, intervening cause occurred after the horse passed from its possession." The trial judge interpreted this as an argument that the provision converted any warranty into a 24-hour insurance policy and, not surprisingly, rejected that notion. He concluded that "At most, the clause means that if any futuristic warranty is stated, it could extend no longer than the period mentioned."
 
 
 32
 We think this provision must be construed simply as setting a time within which defects must be reported in order for the warranty to be valid. The setting of such a deadline does not necessarily mean that any unreasonable delay in inspection or rejection is acceptable so long as it does not extend past the deadline. Had Red Carpet been obviously lame, hobbling badly at the time he was delivered to Finkelstein, and had Finkelstein nonetheless taken the horse away to his barn without comment, it would be unreasonable to say that Finkelstein nonetheless had twenty-four hours to report the defect, because of this provision. On our view of the case, whether rejection was within a reasonable time must be answered with reference to what inspection for defects is customary, and it appears that Finkelstein had no more excuse for taking the horse away without giving its legs the customary inspection than he would have had for taking it away without comment if it had been hobbling. We will not construe a provision which by its terms sets a maximum time for reporting defects to set a minimum time as well, for some defects may be more readily discoverable than others.
 
 
 33
 We conclude, then, that Finkelstein accepted the horse by failing to reject it within a reasonable time, and thus had the burden of proving any breach of warranty. As we have already said, we find ample support for the finding that he failed to prove a breach by a fair preponderance of the credible evidence. The only evidence submitted by the defendants to establish the time of the fracture was the X-rays discussed above, and we have explained why the trial judge found that these lacked sufficient probative force to establish the date of the fracture.[18]
 
 III.
 
 34
 The remaining issues can be disposed of briefly. We first consider those raised by the plaintiffs' claim against Raceway and Raceway's counterclaim. The Terms and Conditions of Sale provided that "No delivery will be made until final settlement." The District Court concluded that Raceway breached that provision by delivering Red Carpet to Finkelstein before receiving final payment, and therefore is jointly liable with Finkelstein for the purchase price, and is not entitled to its commission. Raceway does not argue that if it breached the contract, it nonetheless is not liable for the purchase price and is still entitled to its commission; it merely argues that it did not breach the contract, and, by implication, that any breach was not material.
 
 
 35
 We think that the breach clearly was material. If Raceway had obtained payment before delivering the horse, the provision that no warranty extended beyond final payment would have become applicable, and it is likely that litigation would have been avoided.
 
 
 36
 Raceway's claim that it did not breach the contract by delivery before payment is based upon an alleged custom known to the plaintiffs, permitting the delivery of a horse sold at auction before payment if the buyer is known to be financially responsible and has a running account with the auctioneer. The District Court held that the provision against delivery before final settlement is unambiguous, and that under the traditional New York rule, custom and usage are therefore inadmissible to vary the terms of the provision.[19] Even under the more liberal standard of U.C.C. § 1-205(4),[20] we think that the judge was correct. It is hardly conceivable that in the absence of the provision Raceway would deliver a horse to a buyer without obtaining at least some evidence that payment was owing; thus, we think that the provision against delivery before final settlement must mean more than Raceway argues it means.[21]
 
 
 37
 Both defendants argue that the District Court erred in excluding their Exhibit K, an X-ray taken by Dr. Reid during the trial for purposes of illustrating and supporting the testimony that the difference in intensity between Exhibits B and D1 sufficiently accounted for the fact that callus growth was less visible on D1 than on B. (The apparent difference in extent of callus growth was one of the reasons the trial judge concluded that the X-rays were not taken on the same day, and thus lacked probative force.) The trial judge had the opportunity carefully to weigh the conflicting testimony of the expert witnesses on whether there was a difference in callus growth, and he had a broad discretion in the matter of admission of exhibits intended solely for use as illustrations.
 
 
 38
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 The horse was consigned by Adrien and Gerard Miron Stable, St. Augustin, Quebec, Canada. Adrien and Gerard Miron were the original plaintiffs; after the trial, Gerard Miron died, and Raymond Miron, Gilbert Miron, Vincent Miron and Adrien Miron were substituted as executors of his estate
 
 
 [2]
 This statement was recorded on tape. Plaintiffs have conceded that it constituted a warranty that the horse was sound
 
 
 [3]
 Red Carpet is a "pacer," a racehorse with a lateral gait
 
 
 [4]
 Dr. Brennan testified that the X-rays were taken under his supervision on October 20, 1965. The exhibits which were dated were inscribed "10/21/65" in red crayon
 
 
 [5]
 The horse's groom, who cared for it from September 24, 1965 to October 19, exercising it and rubbing its legs daily, did not see any swelling on the left hind leg, and did not see the horse limping. An X-ray of the horse's left hind leg taken on September 30, 1965 showed that on that date Red Carpet did not have a broken splint bone. Red Carpet raced on September 24, 1965, finishing first; on October 2, 1965, finishing first; and on October 16, 1965, finishing sixth
 
 
 [6]
 Finkelstein does not appeal from that part of the decision below holding him liable to Raceway on the cross-claim, since judgment has not been entered on the cross-claim. The court's determination of no just reason for delay makes the judgment entered appealable. Fed.R.Civ.P. 54 (b)
 
 
 [7]
 Problems might arise, however, if we thought the finding clearly erroneous if one party had the burden of proof, but not if the other did, and the trial judge had clearly showed that he thought burden of proof irrelevant
 
 
 [8]
 The question is the proper construction of "acceptance" as defined in New York Uniform Commercial Code, § 2-606
 
 
 [9]
 See note 5, supra, and accompanying text
 
 
 [10]
 Finding No. 34: "Defendant Finkelstein has failed to prove by a fair preponderance of the credible evidence that a fracture of the splint bone in Red Carpet's left hind leg occurred prior to the sale of the horse on October 19, 1965 to defendant Finkelstein."
 Finding No. 35: "Defendant Finkelstein has failed to prove by a fair preponderance of the credible evidence that the horse was not `sound' at the time of its sale to him on October 19, 1965."
 Conclusion No. 7: "Finkelstein has failed to prove by a fair preponderance of the credible evidence that plaintiffs breached their warranty."
 
 
 [11]
 We suggest that where a District Judge is convinced that a factual determination does not depend upon who has the burden of proof, that be made clear in the findings of fact and conclusions of law
 
 
 [12]
 There was no finding as to how easily a horse's splint bone is broken; testimony indicated that a fracture can result from the horse's kicking itself
 
 
 [13]
 Finkelstein's argument that under New York law the seller must always prove, in an action for the price, that the goods conform, not only contradicts the clear language of U.C.C. § 2-607(4), but is in conflict with the cases he cites for support, which show that the allocation of the burden of proof has always depended upon whether the goods have been accepted or properly rejected. E.g., John Fabick Tractor Company v. Lizza & Sons, Inc., 298 F.2d 63, 65 (2 Cir. 1962); Eureka Fire Hose Co. v. Reynolds, 86 N.Y.S. 753 (App.Term 1st Dept., 1904)
 
 
 [14]
 A "reasonable opportunity to inspect," U.C.C. § 2-606(1) (b), may of course encompass more than merely a reasonable time to inspect; here, there is no question that Finkelstein had the facilities for inspection available, and the only question on appeal was whether he waited too long
 A reasonable period for rejection overlaps a reasonable opportunity to inspect under U.C.C. § 2-606(1) (b). Thus if inspection discloses a defect, there remains the obligation to reject within a reasonable time. But in many cases where the buyer passes up a reasonable opportunity to inspect, he thus fails to reject within a reasonable time, and we think that this is one of those cases, for reasons stated in the text.
 
 
 [15]
 Cf. the cases in which it has been said that what is a reasonable time for inspection is a question of fact for the jury; e.g., Pierson v. Crooks, 115 N.Y. 539, 22 N.E. 349 (1889); Raw Silk Trading Co. v. Kaltenbach & Stephens, 199 App.Div. 799, 192 N.Y.S. 375, 378 (1st Dept., 1922); C. W. Anderson Hosiery Co. v. Dixie Knitting Mills, Inc., 204 F.2d 503, 505 (4 Cir. 1953); see Annot., 52 A.L.R.2d 900 (1957). See also Lerman v. Fruit Processors, 89 U.S.App.D.C. 188, 191 F.2d 349, 355-356, cert. denied 342 U.S. 877, 72 S.Ct. 168, 96 L.Ed. 659 (1951)
 
 
 [16]
 There is no specific finding, as such, to that effect, but the District Court's opinion makes it clear that the court found that there was no rejection within a reasonable time
 
 
 [17]
 The official comment to U.C.C. § 2-602, para. 3, states that the section applies only to rightful rejection by the buyer. Yet acceptance may depend upon whether there has been a rejection under that section, and the allocation of the burden of proving whether there was a defect, and thus whether or not there was "rightful rejection," depends upon whether there has been acceptance. See U.C.C. §§ 2-606(1) (b) and 2-607(4). The only sensible construction of these sections would seem to be that non-acceptance, consisting of attempted rejection within a reasonable time after delivery or tender, amounts to rightful rejection if the seller fails to prove that the goods conform, but is a breach if the seller proves conformity
 
 
 [18]
 If Finkelstein, having accepted the horse, had met his burden of proof, he would have been entitled to damages for non-conformity; see U.C.C. § 2-714
 The conclusion that the defendants did not prove by a preponderance of the evidence that Red Carpet was unsound at the time of sale means, of course, that Finkelstein's counterclaim must fail.
 
 
 [19]
 See Chase Manhattan Bank v. May, 311 F.2d 117, 119 (3 Cir. 1962), cert. denied 372 U.S. 930, 83 S.Ct. 874, 9 L.Ed.2d 733 (1963), and cases there cited
 
 
 [20]
 "The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade."
 
 
 [21]
 Raceway's argument that it is entitled to recover its attorneys' fees from plaintiffs is mistaken; see Shindler v. Lamb, 25 Misc.2d 810, 812, 211 N.Y.S.2d 762, 764-765 (Sup.Ct.N.Y.Co.1959), aff'd 10 A.D.2d 826, 200 N.Y.S.2d 346 (1960), aff'd 9 N.Y.2d 621, 210 N.Y.S.2d 226, 172 N.E.2d 79 (1961)