662 P.2d 661

BOWLIN'S, INC., Plaintiff-Appellee,
Cross-Appellant,

v.

RAMSEY OIL CO., INC., Defendant-Appellant, Cross-Appellee,

and

Joe M. Marez, Defendant,

and

TEXACO, INC., Defendant-Third Party
Plaintiff-Appellant, Cross-Appellee,

v.

G.D. RAMSEY, Third Party Defendant-
Appellant Cross-Appellee.

No. 5561.

Court of Appeals of New Mexico.

March 17, 1983.

Certiorari Denied April 22, 1983.

Mark Shaw, Shaw, Thompson & Sullivan, P.A., Albuquerque, for plaintiff, Bowlin's.

Donald B. Moses, Joseph L. Werntz, Moses, Dunn, Beckley, Espinosa & Tuthill, Albuquerque, for defendant, Ramsey Oil Co. and G.D. Ramsey.

D. James Sorenson, Johnson & Lanphere, P.C., Albuquerque, for Texaco, Inc.

OPINION

WALTERS, Chief Judge.

Plaintiff Bowlin's, Inc. (Bowlin's) is a New Mexico corporation having ten retail outlets, seven of which sell gasoline. This suit arose when the auditing department at its Albuquerque headquarters determined that during a period from February 1, 1978 through May 15, 1979 there had been a shortage in gasoline deliveries made by defendants to its Bluewater outlet in the total value of $70,005.97. The trial court's findings are inconsistent on the question of whether plaintiff fully paid for those shortages. Several findings (Nos. 15, 16, 18, 19 and 20) state that Bowlin's had paid in full for all invoiced deliveries; the trial court's Finding 61 was that Bowlin's withheld payment of $18–19,000 after it discovered that shortages had occurred. Finding 57 intimates that Bowlin's discovered the shortages on April 12, 1979; Finding 55 could be read to indicate that defendants Texaco and Ramsey were notified on May 15, 1979 of the shortage in deliveries. The trial court found the notice of loss was timely.

Bowlin's had a written contract with defendant Texaco during the period from March 15, 1975 through February 28, 1979 for the purchase of gasoline from Texaco, to be delivered to the Bluewater store by G.D. Ramsey and Ramsey Oil Company (Ramsey), Texaco's "consignee." By mutual agreement, that contract was terminated on February 28, 1979. From March 1, 1979 through May 15, 1979 Bowlin's purchased Texaco products directly from Ramsey on an invoice-by-invoice basis rather than under a written contract of purchase and sale but, according to Michael Bowlin, it paid Ramsey on Bowlin's normal accounts payable cycle. Joe Marez was Ramsey's delivery driver during the entire 1975–1979 course of dealings between the parties. The trial court found that Marez deliberately failed to deliver the amounts of gasoline invoiced, but delivered less than shown on the invoices. It also found that Marez knowingly and falsely represented the amounts delivered, intending that Bowlin's rely on his false representations in paying the invoiced amounts; that Bowlin's did rely on those representations to its damage; and that Marez converted the undelivered gasoline to his own use but not for the benefit or at the direction of either Texaco or Ramsey.

The contract between Texaco and Bowlin's contained a notice clause requiring Bowlin's to notify Texaco of any claimed shortage in quantity within 2 days after a delivery had been made. If Bowlin's failed to comply with the claims provision, the failure would operate as a waiver of any and all claims. Adopting some findings requested by Bowlin's, the trial court found the clause "unconscionable," to have "no reasonable commercial purpose," and "limited in its application so as not to defeat" Bowlin's claim. It made a finding that Bowlin's had not waived any claim for delivery shortages. Other of the trial court's 67 findings were that during the periods of the respective contracts, Texaco, Ramsey and Ramsey Oil had breached their contracts, and that Bowlin's had fully complied with the terms of both contracts but "was negligent in not checking the deliveries for accuracy."

The court's Findings 62 through 67 were not requested by any of the parties:

62. The application of the two-day notice clause in the contract to bar the Plaintiff's claim would be unreasonable, would deny fundamental fairness, and would shock the conscience of the Court. It would be equitable to limit the clause to placing a duty on the purchaser to check the loads.

63. The Plaintiff was negligent in failing to check the loads. That negligence contributed to the loss, and this fault of the Plaintiff proximately resulted in 25% of the loss up to April 12, 1979.

64. The Plaintiff was reasonable in failing to notify the Defendants of the discovery until May 15, 1979.

65. It would be inequitable to award attorney fees to Plaintiff, even if attorney fees are authorized.

66. The Defendant Marez knowingly, fraudulently and intentionally caused the Plaintiff to be charged for the shortage between April 12, 1979 and May 15, 1979, and thereby damaged the Plaintiff $5,481.70.

67. Texaco's wrong and Ramsey's wrong was the proximate cause of 75% of Plaintiff's damage of $59,497.53, incurred up til March 1, 1979. Ramsey Oil Company's wrong was the proximate cause of 75% of Plaintiff's damage of $5,026.74 for the period 3–1–79 to 4–11–79, and for all of the damage of $5,481.70 for the period 4–12–79 to 5–15–79.

The conclusions of the trial court pertinent to this appeal are as follows:

2. For the period February 1, 1978, to May 15, 1979, Ramsey Oil Co., Inc., breached the various contracts with Bowlin's, Inc. represented by the invoices.

3. Intentional failure to deliver the full amount of gasoline products called for by an invoice by an employee of the seller or his consignee is not a loss in the normal course of business.

4. The claims clause as applied to the factual situation presented in this case has no reasonable commercial purpose.

5. The two-day claims clause in the contract dated March 15, 1975 has only limited application to the losses suffered by Plaintiff, Bowlin's Inc. in the within cause of action.

6. The two-day claims clause in the contract dated March 15, 1975 is unconscionable and should be limited in its application so as not to defeat the claim of Bowlin's, Inc., in the present circumstances.

7. Bowlin's, Inc. did not fully waive any claim in the premises for delivery shortages.

8. Bowlin's properly notified Defendants of the loss and such notice was timely.

9. The undelivered gasoline remained the property of said Defendants notwithstanding full payment by Bowlin's, Inc.

10. Defendant Joe M. Marez was unjustly enriched by the actions of Joe M. Marez.

11. Bowlin's, Inc. is entitled to judgment against Defendants Texaco, Inc., G.D. Ramsey, Ramsey Oil Co., Inc., and Joe M. Marez, jointly and severally, as compensatory damages in the sum of $59,497.53.

12. Bowlin's, Inc. is entitled to judgment against Defendants G.D. Ramsey, Ramsey Oil Co., Inc., and Joe M. Marez, jointly and severally, as compensatory damages in the additional sum of $10,508.44.

16. The contract between the Plaintiff and Texaco, Inc. was entered into between experienced and sophisticated business concerns.

17. The provision in the contract relating to claims and requiring those relating to quantity to be made within two (2) days is not an ambiguous paragraph.

18. A printed provision in the contract relating to claims ˜and requiring those related to quantity and quality to be made within two (2) days is a reasonable and lawful provision, in general.

19. The printed provision in the contract relating to claims and requiring those related to quantity and quality to be made within two (2) days is not an unconscionable provision, in general.

20. The Plaintiff has failed to establish by a preponderance of the evidence that it sought any alternative sources of gasoline without clauses in their contracts relating to a two-day or similar limitation on giving notice of deficiencies in quantities of gasoline delivered, or alternatively, that in seeking such other sources of gasoline supply, it encountered similar language of limitation in contracts with other suppliers.

21. The contract between the Plaintiff and the Defendant Texaco, Inc. was not an adhesion contract.

22. The contract between the Plaintiff and the Defendant Texaco, Inc. was a valid and binding contract in all respects.

23. That the contract between the parties and the delivery of gasoline involved is governed by the provisions of the Uniform Commercial Code.

24. That the Defendant, G.D. Ramsey, terminated his performance of any obligations under Defendant Texaco, Inc.'s contract with the Plaintiff on the 28th day of February, 1979; that thereafter deliveries of gasoline were made to the Plaintiff by the Defendant, Ramsey Oil Co., Inc. and that no judgment should be entered against the Defendant G.D. Ramsey, for any happenings after the 28th day of February, 1979.

25. That the Plaintiff has failed to establish by a preponderance of the evidence that the Defendant G.D. Ramsey was negligent in his selection, control and supervision of the Defendant Joe M. Marez.

26. That the Plaintiff has failed to prove by a preponderance of the evidence that the Defendant G.D. Ramsey committed any acts as against the Plaintiff in a reckless and wanton disregard of the rights of the Plaintiff.

27. That the Plaintiff has failed to establish by a preponderance of the evidence that the Defendant G.D. Ramsey retained any of the gasoline which was the subject of the invoices and sales to the Plaintiff and that he retained the fruits of any wrongful acts of the Defendant Marez.

**664**

28. That the doctrine of unjust enrichment does not apply in this action because the Plaintiff has failed to establish that the Defendant G.D. Ramsey has received the fruits of any wrongful acts of anybody.

29. The failure of Plaintiff to have locks on its storage tanks to protect against thefts violated a reasonable standard of care.

30. That the failures of the Plaintiff through its agents, servants and employees to make inspections both before and after deliveries of truck tank compartments violated a reasonable standard of care which it imposed upon its employees.

31. That the failures of the Plaintiff through its agents, servants and employees to make inspections both before and after deliveries of truck tank compartments constituted conduct below customary standards for the receiving of such products.

34. That as to all deliveries including those prior to April 12, 1979, the Defendant Ramsey Oil Co., Inc. was not advised until May 15, 1979 of any claimed shortage.

37. It would be unconscionable to apply the two-day notice clause to bar the Plaintiff's claim. The effect of the clause is limited to placing a duty on the purchaser to check the loads. Equity requires that much and precludes more.

38. The negligence of the Plaintiff was the proximate cause of 25% of Plaintiff's loss before April 12, 1979. The wrong of Defendants was the proximate cause of 75% of the loss up until April 12, 1979, and all of the loss thereafter.

Joe Marez did not appeal the judgment holding him jointly and severally liable for all shortages, plus punitive damages. The Ramsey defendants and Texaco appeal, arguing that conduct of Bowlin's, not theirs, permitted the shortages; that Bowlin's waived any claims by failure to give timely notice; that Marez's fraud was outside the course of his employment; and that Bowlin's allowed gasoline to be stolen between April 12 and May 15, 1979 without notifying

defendants that there was any shortage in deliveries. Bowlin's cross-appealed on the comparative liability assessed against it and on the theory of unjust enrichment.

Our difficulty with this case has been in our efforts to untangle the theories of liability and damages employed by the trial court. The findings and conclusions, if sustained, are susceptible of offering a little support to every position argued by every party to this appeal. The court refused requested findings and conclusions that the Ramseys negligently selected and supervised Marez or that such negligence proximately caused Bowlin's loss. It refused to hold that Bowlin's discovery of shortages was timely. And it refused conclusions that Bowlin's justifiably relied on the delivery of the amounts of gasoline stated in the invoices. It did make findings and conclusions that Texaco and Ramseys had breached their contracts; that Bowlin's had fully performed; and that Marez converted the undelivered gasoline and was unjustly enriched by his actions.

I. Theories of Liability.

From the court's findings and conclusions, we glean that Marez was found liable for fraud and misrepresentation in the total amount of the loss suffered by Bowlin's for the undelivered but invoiced gasoline, and for $11,000 punitive damages. We also conclude that the trial court held Texaco and the Ramseys liable for breach of contract in the amount of 75% of the value of the delivery shortages occurring between February 1, 1978 through February 28, 1979 (in the total value of $59,497.53); that Ramsey Oil was held liable for breach of contract for 75% of the value of the undelivered gasoline from March 1, 1979 to April 11, 1979 ($5,026.74), and for breach of contract for the full value of the undelivered gasoline between April 12, 1979 and May 15, 1979 ($5,481.70). The trial court then assessed a comparative liability of 25% against Bowlin's from February 1, 1978 through April 11, 1979.

We particularly note that the trial court, although finding that Texaco and Ramseys

"provided the means for * * * Marez to commit his wrongful acts, and clothed * * * Marez with the necessary authority," made no conclusions that Texaco and the Ramseys were liable for Marez's intentional fraud or conversion on agency, vicarious liability, or respondeat superior theories. Plaintiff urged at oral argument that it was entitled to the recovery awarded against all defendants on grounds of breach of contract, vicarious liability for the fraud of Marez, and for defendants' unjust enrichment, but its complaint was tried on allegations of breach of contract, negligent hiring and retention of Marez, and unjust enrichment/equitable estoppel against Texaco and Ramseys; and on fraud and unjust enrichment/equitable estoppel against Marez.

It thus appears from a reading of all of the findings and conclusions that the liability of Texaco and the Ramseys was based solely on findings of breach of contracts, and that Marez's liability was grounded on fraud, misrepresentation and unjust enrichment.

## II. Texaco's and the Ramseys' Appeals.

Since the judgment against Marez has not been appealed, we examine only the challenged findings and conclusions underlying the judgments against Texaco and the Ramseys.

The appealing defendants jointly challenge almost all of the court's findings, but particularly stress that the following findings (omitting typographical errors), as well as findings 62, 64, and 67, are erroneous:

13. From February 1, 1978, through May 15, 1979, Defendant, Joe M. Marez, intentionally delivered less gasoline than invoiced to Bowlin's, Inc., at its Bluewater Trading Post.

14. Bowlin's, Inc., paid to Defendants Texaco, Inc., G.D. Ramsey and Ramsey Oil Co., Inc. the full amount listed on the delivery invoices.

15. From February 1, 1978, through February 28, 1979, Defendants, Texaco, Inc., G.D. Ramsey, Ramsey Oil Co., Inc., and Joe M. Marez failed to deliver gasoline for which Bowlin's, Inc. paid $59,497.53.

16. From March 1, 1979, through May 15, 1979, Defendants, Ramsey Oil Co., Inc., and Joe M. Marez failed to deliver gasoline for which Bowlin's paid a total of $10,508.44.

17. Bowlin's complied fully with all terms required of it by the contract between Bowlin's, Inc., and Texaco, Inc., dated March 15, 1975, and the various contracts with G.D. Ramsey and Ramsey Oil Co., Inc., represented by the various delivery invoices, except that Bowlin's was negligent in not checking the deliveries for accuracy.

18. For the period February 1, 1978, through February 28, 1979, Texaco, Inc., G.D. Ramsey, and Ramsey Oil Company, Inc., breached the contract dated March 15, 1975, with Bowlin's, Inc., by failing to deliver the full amount of gasoline products to Bowlin's Bluewater Trading Post for which they charged Bowlin's, Inc., as set forth in the invoices, and for which Bowlin's, Inc., paid in full.

19. G.D. Ramsey and Ramsey Oil Co., Inc., breached the various contracts with Bowlin's, Inc., as evidenced by its invoices to Bowlin's, Inc., by failure to deliver the full amount of gasoline listed on the invoices from February 1, 1978, to May 15, 1979, and for which Bowlin's, Inc., paid.

21. The amount of gasoline products actually delivered by Defendant, Joe M. Marez, to Bowlin's, Inc., at its Bluewater Trading Post, was less than the amount shown on the invoices and for which Bowlin's, Inc., paid; that Defendant, Joe M. Marez, knew that his representations as to the amount of gasoline delivered to Bowlin's, Inc., were false, and Defendant, Joe M. Marez, expected and intended that Bowlin's, Inc., would rely on such false representations in making payment of the invoice amount; that Bowlin's, Inc., did so rely to its damage.

22. Defendant, Joe M. Marez expected that Bowlin's, Inc., and its agents and employees would not check the amount of gasoline actually delivered, but would

rely on his representations as contained on the invoices, and he deliberately delivered less gasoline than called for by the various invoices, fully expecting that Bowlin's, Inc. would pay the invoice amount.

23. Defendants Texaco, Inc., G.D. Ramsey and Ramsey Oil., Inc. provided the means for Defendant Joe M. Marez to commit his wrongful acts, and clothed Defendant Marez with the necessary authority.

24. Defendant, Joe M. Marez, converted the gasoline paid for by Bowlin's, Inc., which was not actually delivered to Bowlin's, Inc. to his own use, or to the use of others.

26. Intentional failure to deliver the full amount of gasoline products called for by an invoice by an employee of the seller, or his consignee, is not a loss in the normal course of business.

27. The claims clause, as applied to the factual situation presented in this case, has no reasonable commercial purpose.

28. The two-day claims clause in the contract dated March 15, 1975, is unconscionable, and should be limited in its application so as not to defeat the claim of Bowlin's, Inc. in the present circumstances.

29. Bowlin's, Inc. did not waive any claim in the premises for delivery shortages.

30. Following the discovery of the loss as a result of inventory procedures, Bowlin's, Inc. timely instituted an investigation to trace the loss, and ultimately discovered that the loss resulted from the failure by the Defendants to deliver the full amount of gasoline listed on the various invoices.

31. Bowlin's, Inc. properly notified Defendants of the loss, and such notice was timely.

32. The undelivered gasoline, at all ·times material, was under the control of Defendant Joe M. Marez, the agent or employee of Defendants Texaco, Inc., G.D. Ramsey and Ramsey Oil Co., Inc., and remained the property of said De-

fendants notwithstanding full payment by Bowlin's, Inc.

33. Defendant Joe M. Marez' failure to deliver the full amount of gasoline products invoiced was a deliberate, willful act done in gross disregard of the rights of Bowlin's, Inc. and Defendant, Joe M. Marez, should be liable to Bowlin's, Inc., for punitive damages.

**A. The period from February 1, 1978 through February 28, 1979.**

Many of the challenged findings relate to the period of the written contract with Texaco. We think that most of the challenged findings will be resolved if we determine first whether there was a breach in the terms of the contract in effect at the time.

 The breach of contract issue was resolved in favor of plaintiff upon the plaintiff's and the trial court's view that failure to deliver the full amount of gasoline, for which Bowlin's was charged, was a breach of Texaco's and the Ramseys' obligation to Bowlin's, and that the breach was not waived because the required two-day claim notice imposed upon Bowlin's was unconscionable, unenforceable and without reasonable commercial purpose. Whether these views were expressed in findings rather than only in the court's conclusions, it is clear from § 55–2–302, N.M.S.A.1978, that a determination of unconscionability in a contract clause is a matter of law. It is further an invulnerable rule that a reviewing court is free to make its own conclusions of law when the facts are not in dispute. *Martinez v. Martinez,* 93 N.M. 673, 604 P.2d 366 (1979).

 The trial court concluded that, in general, a contract provision requiring claims to be made within two days is reasonable, lawful, and not unconscionable, and that the claims provision in this contract was not ambiguous. We agree with those conclusions. It also concluded that the written agreement was not an adhesion contract. It not only found that plaintiff had also sold gasoline furnished to its outlets by Mobil, Phillips, Chevron, Shell, Cono-

co, Gulf, Fina, Deep Rock, Plateau, Giant and Caribou—all gasoline products distributors—but it concluded that Bowlin's had failed to establish either that it had sought suppliers who did not have a two-day clause in their contracts or that in seeking such suppliers it had encountered similar clauses.

A Texaco representative testified that some of the reasons for the two-day claim notice were to give the company control of complaints that had to be investigated, to allow a representative of their carrier the opportunity to inspect a shortage claim at the earliest moment, to comply with inspection requirements of the ICC, and to immediately pump out tanks when lead-free gasoline might have been diluted so that customers' cars would not be ruined; but that "mainly, if there is a shortage involved, they [sic] will be investigated immediately."

The executive vice president of Bowlin's admitted that he was fully aware of the two-day requirement and understood what it meant. Bowlin's management established a specific procedure for measuring deliveries and verifying invoices. It issued a memorandum on December 2, 1976, to all of its stores selling gasoline, in which it set forth the verifying procedures and emphasized that "*there are no exceptions.*" (Emphasis in the memo.) The policies and procedures established by that memorandum were never withdrawn by Bowlin's, and were not changed during the period with which this lawsuit is concerned. Mr. Bowlin agreed that if the instructions and procedures established *in 1966* and evidenced in the December 1976 memorandum had been followed, store personnel would have been able to determine that the gas being charged to Bowlin's was the gas actually being delivered and that the quantity and grade were both correct, and the quantity being delivered was actually the quantity shown on the invoice. He acknowledged that inspection on delivery, as required by company policy, would have avoided any payments for gasoline not delivered and would have provided immediate evidence of a delivery driver's attempt to "short load"; it would have furnished a safety factor against an inventory shortage, and could

have alerted Bowlin's to possible leaks in the storage tanks or in the delivery trucks so that action could be taken to avoid fires or other hazards. When asked if Bowlin's would have been able to immediately comply with the claims clause of the contract, had the procedures outlined by management been adhered to, Mr. Bowlin responded: "If the procedures has been followed as was written, yes."

The reasonable commercial purpose of the claims provision, if not obvious to an ordinarily intelligent buyer, at once becomes manifest by the testimony of plaintiff's own witness.

Whether, on the other hand, a two-day limitation for reporting or suffering a waiver of any claims was unconscionable must be governed by the meaning of §§ 55–2–302 of the Uniform Commercial Code, (hereafter "Code"). The statute does not define "unconscionability"; one New Mexico case held a contract enforceable because "the contract [was] not contrary to substantive fairness nor unconscionable in its terms." *Smith v. Price's Creameries, Div., etc.,* 98 N.M. 541, 545, 650 P.2d 825, 829 (1982). We construe the meaning of "unconscionability" within the context of the facts of this case, decisions from other jurisdictions, and with guidance from writers and the official Comment accompanying the statute. The Comment reads, in significant part,

> The basic test [of unconscionability] is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract.

Bowlin's argued that one-sidedness existed because the entire risk of loss was shifted to Bowlin's if a claim were not timely made in accordance with the contract terms. In so arguing it overlooks § 55–2–303, N.M.S.A.1978, which permits the contracting parties, by agreement, to shift or divide the risks otherwise allocated or im-

posed by Article 2 of the Code, "subject of course, to the provisions on unconscionability." Official Comment, § 55–2–303.

The recognized Code authorities, J. White & R. Summers, in their hornbook treatise, Uniform Commercial Code (2d ed. 1980), point out at p. 149 that

Most parties who assert 2–302 [Same as § 55–2–302, N.M.S.A.1978] and most who have used it successfully in reported cases have been consumers. Most of these successful consumer litigants have been poor or otherwise disadvantaged. Since much current literature suggests that the low-income consumer is often the victim of sharp practices, it is not surprising that the targets of the unconscionability doctrine are usually plaintiff-creditors and credit sellers. The courts have not generally been receptive to pleas of unconscionability by one merchant against another. Presumably, few businessmen and middle-class cash purchasers are victims of the kinds of gross advantage-taking that usually calls forth 2–302.

In an early case concerned with this section of the Code, *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445 (D.C.Cir. 1965), the court looked at the two faces of what text-writers have called procedural unconscionability (fraud, duress, or unequal bargaining power at the making of the contract), and substantive unconscionability (contract clauses which are illegal or contrary to public policy), and said:

Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.

350 F.2d at 449. The court continued, in language applicable to the instant case as well:

In determining reasonableness or fairness, the primary concern must be with the terms of the contract considered in light of the circumstances existing when the contract was made. The test is not simple, nor can it be mechanically applied. The terms are to be considered "in

the light of the general commercial background and the commercial needs of the particular trade or case." Corbin [1 CORBIN, CONTRACTS, § 128 (1963)] suggests the test as being whether the terms are "so extreme as to appear unconscionable according to the mores and business practices of the time and place . . . . . We think this formulation correctly states the test to be applied in those cases where no meaningful choice was exercised upon entering the contract. (Citations and footnotes omitted.)

350 F.2d at 450.

Bowlin's executive vice president fully understood the terms of the claim clause and recognized the several salutary purposes it would serve, not the least of which purposes he acknowledged as permitting Bowlin's to know that the amount of gasoline being paid for was the actual amount delivered. The trial court's conclusions 16 through 23 negate any contention that the claim requirement was coercive, unusual, one-sided, or contrary to public policy. The contract was entered into between "experienced and sophisticated business concerns." (Court's conclusion 17.) Consequently, placement of the burden of loss solely on Bowlin's for failure to make a timely claim, does not alone make the contract unconscionable.

Was the two-day inspection and claim provision so unreasonably short that it was unconscionable? We must first acknowledge that it was a specific term of the contract, known and agreed to by the plaintiff. Our supreme court said in *Herrera v. C & R Paving Co.*, 73 N.M. 237, 240, 387 P.2d 339 (1963), that "courts will not ordinarily relieve either party from the effect of its binding agreement, absent fraud or imposition or a mistake against which equity will afford relief."

Sections 55–2–602 and 55–2–608 of the UCC permit a buyer to reject after delivery, or revoke after acceptance, and thereby recover or be relieved of payment for the goods, if the goods do not conform in accordance with the terms of the contract (*see* § 55–2–106(2), N.M.S.A.1978). But § 55–

2–602 requires the buyer to "seasonably" notify the seller of rejection, and §§ 55–2–607(3)(a) and 55–2–608(2) require the buyer to give notice of the nonconformity within a "reasonable time" after he "discovers or should have discovered" any breach in the contract terms. Plaintiff contends that "non-delivery" is not the same as "non-conforming." If there had been no delivery at all, we might be able to see a distinction; the difference is not present in this case.

The Official Comment to § 55–2–602 of the Code, which deals with the manner of rejecting delivery or tender of non-conforming goods, notes that "[c]ontract provisions limiting the time for rejection fall within the rule of the section on 'Time' and are effective if the time set gives the buyer a reasonable time for discovery of defects." The Comment under § 55–2–607 admonishes that "[t]he time of notification [to be reasonable] is to be determined by applying commercial standards to a merchant buyer." Section 55–1–204(1) specifies that "[w]henever . . . [this chapter] requires any action to be taken within a reasonable time, any time which is not manifestly unreasonable may be fixed by agreement." The Comment following that section reads:

> Subsection (1) recognizes that nothing is stronger evidence of a reasonable time than the fixing of such time by a fair agreement between the parties. However, provision is made for disregarding a clause which whether by inadvertence or overreaching fixes a time so unreasonable that it amounts to eliminating all remedy under the contract. The parties are not required to fix the most reasonable time but may fix any time which is not obviously unfair as judged by the time of contracting.

The clearest evidence of the reasonableness of the time agreed upon is plaintiff's own operating memorandum of December 2, 1976 entitled "Procedures for Verifying the Quantity of Gasoline Delivered to Your Store." The store employees were directed to follow the detailed procedures "in every case." They were instructed to physically measure the contents of the storage tanks after close of business at night and again in the morning before opening if deliveries were made at night; alternatively, they were to visually inspect and assure themselves that the delivery tanker was full before gasoline was dropped into the underground tanks, and that it was empty after unloading, if deliveries were made during working hours. Certification of the accuracy of each invoice was to be made a part of each invoice by the store manager and the inspecting employee, and any difference in invoiced and delivered quantity figures was to be reported to the main office "immediately." The memorandum, imposing immediate inspection duties on Bowlin's employees by Bowlin's management, allays any suggestion that shortages would be difficult to discover. *See* Michael M. Berlin & Co. v. T. Whiting Mfg., Inc., 5 UCC Rep.Serv. (Callaghan) 357 (N.Y.S.Ct.1968) (notice of rejection of steel 13 weeks after delivery untimely when thickness inspection could have been made by use of micrometer with minimum of effort); and *Miron v. Yonkers Raceway, Inc.,* 400 F.2d 112 (2d Cir.1968) (claim of breach for horse warranted to be sound made day after purchase and delivery untimely when customary examination of horse's legs at time of purchase would have disclosed claimed defect).

If inspection for shortages could be accomplished and knowledge thereof acquired within hours after, or just before gasoline deliveries were made, it would be patently untrue for anyone to claim that a 2-day period for reporting any shortages found is unreasonable, impossible of performance, or even onerous. Thus the 2-day period, under the circumstances of this case and the nature of the goods concerned, is insufficient by itself to render the clause unconscionable.

Professors White and Summers, *supra,* at page 309, suggest that there are

> four "circumstances" which will always have relevance to the determination of whether a reasonable time has passed before the buyer took his action to reject or revoke:
>
> (1) the difficulty of discovering the defect,

(2) the terms of the contract,

(3) the relative perishability of the goods, and

(4) the course of performance after the sale and before the formal rejection[.]

We have discussed the first two "circumstances," and have alluded to the testimony of the witnesses regarding loss of gasoline by leakage. There is also testimony of "shrinkage" under some conditions. The evidence on the fourth circumstance was that even though losses were claimed from February 1, 1978 forward, defendants or some of them continued to deliver gasoline, and plaintiff continued to pay for the invoiced amounts at least until April 12, 1979 when plaintiff commenced its investigation, but plaintiff did not advise any of the defendants of its suspicions or discovery until May 15, 1979. White & Summers views the fourth factor concerning course of performance after sale but before rejection or revocation as a means, by proof of continuing complaints, negotiations and attempted remedy of alleged defects, to establish that the seller has been given the opportunity to cure and to assist in minimizing the buyer's losses.

Without performing inspections which would lead to complaints by plaintiff during the period of Texaco's contract, it would be difficult for Texaco to respond to claims of shortage and to attempt minimization of plaintiff's losses. We must hold that the buyer's entire course of conduct before, during and after the various sales which aggregated the total losses claimed, completely failed to serve the notice requirements of the contract or of §§ 55–2–602 or –608; that is, to allow the seller the opportunity to rectify non-conforming deliveries. *See* White & Summers, *supra,* at p. 312.

Therefore, considering all of the undisputed facts presented in the court below, and applying the provisions of the Uniform Commercial Code which govern in this case, we reverse the trial court's conclusion that the claims clause was unconscionable. We hold, instead, that under its terms, by failure to make its claims within two days of each delivery, plaintiff waived any and all claims for defect or shortage in quantity contracted for. It follows that plaintiff's recovery against Texaco and Ramsey for breach of contract up to March 1, 1979 must also be reversed.

**B. The period from March 1, 1979 through May 15, 1979.**

■ Ramsey Oil Company was held liable for shortages in deliveries after Texaco's written contract was terminated on February 28, 1979, when Ramsey Oil became the distributor (rather than consignee) of Texaco's products. Ramsey Oil and Bowlin's did not enter into a written contract, but the parties do not deny that a contract existed. *See* § 55–2–201(3)(b) and (c), N.M.S.A.1978. Regarding its terms, Mr. Bowlin testified:

It was just an oral agreement. As I remember, something to the effect, in talking to Ramsey or maybe someone from Texaco at that time then, about [the time of] the switch-over, was that it would be "business as usual"—virtually no change in procedure.... I think the only change was that we made the checks out to Ramsey where before we made them out to Texaco. That was the only change.

The trial court assessed 25% of the loss against Bowlin's up until April 12th; this denial of a complete recovery is explained by finding 17 and conclusion 38—that Bowlin's was negligent in not checking deliveries for accuracy and this negligence was the proximate cause of 25% of the loss before April 12, 1979. The failure to check deliveries is established by the evidence. However, no legal issue of "negligence" by failure to check deliveries was raised by the parties; this was interjected, unsolicited, by the trial court. *See Coe v. City of Albuquerque,* 76 N.M. 771, 418 P.2d 545 (1966). The trial court interjected negligence for failure to check deliveries, but in its conclusion 37 ruled that the time period for giving notice of a shortage would not be applied. If the deliveries had been checked and a shortage discovered (as was the situation after April 12, 1979), the legal issue raised would be timely notice of a claim. That is

also the legal issue affecting the period between March 1, 1979 and April 12, 1979. Negligence in failing to check deliveries was an evidentiary matter, but it is a false legal issue. *See* trial court's conclusion 37.

Section 55–2–201, provides that contracts for sale of goods for a price of $500 or more if not in writing are not enforceable. However, subsections (3)(b) and (c) of the section recognize exceptions when "the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made," or when goods have been received and accepted or payment has been made and accepted. Both of those exceptions apply in this case, and the existence of an oral contract between Ramseys and Bowlin's is not contested by either party. It is the terms of that contract, particularly regarding notice of and claims for breach resulting from delivery of non-conforming goods, that must be ascertained from the proofs offered.

Some of the terms are evidenced by the invoices, and they may be considered "confirmatory memoranda" as referred to in § 55–2–202 of the Code. That section permits supplementation of a contract's terms "by course of dealing or usage of trade (Section [55–]1–205) or by course of performance (Section [55–]2–208)."

The evidence in this case is that virtually nothing changed after the Texaco written contract was terminated, and the oral contract was entered into. Mr. Bowlin: "It was 'business as usual.'"

If, therefore, the transaction between Bowlin's and Ramseys changed only in the manner of payment, and Bowlin's requirement of inspection upon delivery continued (as its vice president said it did), then Bowlin's duty to report non-conforming deliveries within two days also continued. By a course of dealing for more than three years under a contract identical in all respects other than to whom payment would be made, the provisions of which were fully known to and understood by the buyer who had the obligation to give timely notice or waive any and all claims, the terms of that contract carried over into the arrangement between Bowlin's and Ramseys.

"A course of dealing between parties and any usage of trade in the ... trade in which they are engaged *or of which they are or should be aware* ... supplement or qualify terms of an agreement ...." Section 55–1–205(3), N.M.S.A.1978. (Our emphasis.) "An applicable usage of trade in the place where any part of performance is to occur shall be used in interpreting the agreement as to that part of the performance." Section 55–1–205(5). "That a party is bound by a trade usage of which he 'should be aware' implies that a limitation of damages may be imposed even if the parties did not explicitly and expressly negotiate it." *Posttape Associates v. Eastman Kodak Co.,* 537 F.2d 751, 756 (3d Cir. 1976).

We have held in Part A above that the 2-day requirement was not unconscionable and that it served a reasonable commercial purpose. Consequently, any notice of breach by Ramseys prior to April 12, 1978 was not timely made, and by its failure to perform that portion of the agreement Bowlin's waived its claim. Imposition of liability upon Ramseys for 75% of the losses suffered to that date cannot be upheld.

Likewise, the deliberate failure to notify Ramseys of shorted deliveries between April 12 and May 15, 1979 must also be deemed a waiver of claims. Trade usage and the course of prior dealing required the claim to be made within 2 days of discovery, and the trial court was in error in concluding that notice almost 5 weeks after knowing of the shortage was timely. However, on May 16, 1979, Ramsey was made aware of a claimed shortage for $721.62 related to a delivery made to Bowlin's on May 15th. Notice of that shortage was timely, and the shortage was not rectified.

The judgments against Texaco and Ramseys for breach of contract are reversed, except to the extent that a judgment for $721.62 against Ramseys should be entered in favor of Bowlin's.

C. Bowlin's Cross-Appeal.

■ Bowlin's first challenges the trial court's apportionment of liability for its

losses, contending that comparative negligence has no application to actions for breach of contract or for intentional tort. We have held that neither Texaco nor Ramseys may be held liable in breach of contract except for one day's shortage that Ramseys were aware of on May 16th, because Bowlin's waived its claims for all other breaches. To the extent that the judgment would impose 25% of the $721.62 loss upon Bowlin's, the judgment is reversed. Comparative liability is not part of the Uniform Commercial Code under which this case is decided.

◼ For its second point, Bowlin's claims that the "appellants" (Texaco and Ramseys) were unjustly enriched by the retention of monies paid for goods not delivered. The trial court concluded that Marez was unjustly enriched. It refused that portion of plaintiff's requested finding which would have found unjust enrichment in Texaco and Ramseys as well. The evidence supports the finding of Marez's unjust enrichment; it supports also the trial court's finding 53 that plaintiff failed to establish that any delivery shortages benefited Texaco or G.D. Ramsey, and finding 50 that neither Texaco nor Ramseys retained any of the undelivered gasoline. There is nothing in this record to suggest that Texaco and Ramseys did not deliver to Marez the full amount of gasoline shown in the invoices; there is, similarly, no evidence that Marez's unjust enrichment passed through to either of his principals. Without a showing of benefit to those parties, there could have been no unjust enrichment theory upon which to impose liability upon Texaco or Ramseys. *Toltec International, Inc. v. Village of Ruidoso*, 95 N.M. 82, 619 P.2d 186 (1980).

◼ Recurring throughout the arguments of plaintiff is the reference to equitable estoppel which we are told means, in the context of this case, that Texaco and Ramsey allowed Marez the opportunity to defraud Bowlin's and, therefore, they should be made to respond for Bowlin's losses under agency and apparent authority theories. At oral argument, plaintiff pointed to the trial court's finding 23 as support for its theory of equitable estoppel, urging that this was, in effect, a finding that Texaco and Ramseys were or should have been held vicariously liable for Marez's fraud. Equitable estoppel in UCC cases ordinarily has been applied to statute of fraud defenses. White & Summers, *supra*, § 2–6 at 68–70; *see also* Bender's U.C.C. Service, R. Duesenberg & L. King, Sales & Bulk Transfers, § 2.04[6] at 2–103 to 2–110. Plaintiff's argument sounds more in the nature of equitable estoppel as might be asserted outside the Code. *See, e.g.,* *State Farm Mutual Automobile Ins. Co. v. Gonzales,* 83 N.M. 296, 491 P.2d 513 (1971); § 55–1–103.

The argument glosses over the requirements under applicable equitable estoppel principles that the party estopped must know or have knowledge imputed to it of concealed material facts at the time of concealment, and the party asserting estoppel does not know the truth of the facts but relies on the other's conduct to its detriment. *See McDonald v. Kerr-McGee Corp.,* 93 N.M. 192, 598 P.2d 654 (Ct.App.1979), where the full doctrine of equitable estoppel, taken from *Chambers v. Bessent,* 17 N.M. 487, 134 P. 237 (1913), is completely set out.

◼ As between Bowlin's and Marez, equitable estoppel might apply to deny a defense to Marez. As between Bowlin's and the other defendants, however, there is no evidence that defendants knew of Marez's defalcations, or had any reason to suspect such conduct in absence of complaint from Bowlin's. Ramseys made irregular spot checks of its trucks to make sure they were full when they left the bulk plant and were empty when they returned. There were also occasional spot checks of the driver's route and time consumed in making deliveries. There was little more they could do than depend upon the signed customer invoices to be assured that the correct quantities were being delivered to their customers. On the other hand, Bowlin's own internal operating procedures evidenced its recognition of its superior opportunity and ability to detect losses; and its employees

were instructed, in effect, to place no reliance whatever on the amounts stated in the delivery invoices.

We are not in the least persuaded that Texaco or Ramsey, through agency principles, were any more responsible than was Bowlin's, through inertia, slothful business practices and non-performance of its duty to comply with the claims clause, for creating a situation that allowed Marez to perpetrate his fraud. Nor are we persuaded that Marez was acting within the scope of actual or apparent authority when he converted his principals' or the buyer's gasoline to his own purposes. *See Bruton v. Sakariason,* 21 N.M. 438, 155 P. 725 (1916).

Section 261 of the Restatement of Agency 2d (1958), upon which Bowlin's relies, is followed by an official comment which notes that liability is placed upon a principal for his agent's fraud because "from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him." As we have observed several times already in this opinion, Bowlin's imposed upon itself and its employees inspection requirements that questioned every assumption that any transaction was "regular on its face." The instructions and memorandum testified to and introduced into evidence addressed only a single issue: the procedures "for *verifying* the quantity of gasoline delivered" and requiring a "written note . . . authorizing payment of the invoice and *certifying to its accuracy.*" (Our emphasis.) The preliminary status of Bowlin's as a trusting, innocent third party does not exist in this case so as to permit it to call upon the provisions of § 261 of the Restatement of Agency.

*Cf. Lucas v. Liggett & Myers Tobacco Co.,* 50 Haw. 477, 442 P.2d 460 (1968).

Early in this opinion we pointed out that although the trial court made finding 23, it did not conclude that defendants were liable for Marez's fraud. The absence of such a conclusion is consistent with other findings. Finding 42 refers to Bowlin's instructions to its employees for checking deliveries, which we have discussed. Findings 43 and 60 are that the Ramseys instructed their delivery personnel to request that the customer check the delivery truck prior to the delivery to determine that the tank compartment was full, and to check after the delivery to determine that the tank compartment was empty. Considering findings 42, 43 and 60, which are not challenged, and the failure of the trial court to conclude that Texaco or the Ramseys were liable for Marez's fraud, we cannot hold, as a matter of law, that finding 23 compels a conclusion that they are liable.

We reverse the judgments of the trial court against the appealing defendants except to the extent of affirming plaintiff's recovery against Ramseys in the amount of $721.62, and leave undisturbed the judgment against Marez. Texaco and Ramseys shall recover their appellate costs from Bowlin's.

IT IS SO ORDERED.

WOOD and BIVINS, JJ., concur.