709 P.2d 675

**H.J. GUTHMANN, Personal Representative of the Estate of Kathleen MacKay, Deceased, Plaintiff-Appellant,**

v.

**LA VIDA LLENA, A New Mexico non-profit corporation, Defendant-Appellee.**

No. 15809.

Supreme Court of New Mexico.

Nov. 21, 1985.

Elvin  Kanter,  P.A.,  Albuquerque,  for
plaintiff-appellant.

Allen C. Dewey, Jr., Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, for defendant-appellee.

## OPINION

WALTERS, Justice.

Plaintiff H.J. Guthmann, personal representative of Kathleen MacKay, deceased, sought a refund of the entrance fee paid by Mrs. MacKay to defendant LaVida Llena (LVL), a non-profit, life-care retirement center. Guthmann's complaint alleged that the Residence Agreement requiring the entrance fee is unconscionable and an unenforceable adhesion contract. The trial court found for the defendant and Guthmann appeals. We affirm.

Kathleen MacKay was 79 years old, with a life expectancy of 7–9 years, when she began looking for a retirement/life-care facility. She visited and considered a number of facilities in the Sante Fe and Albuquerque area. After seeing LVL, she took several weeks to study the Residence Agreement, discussing it with a close friend, but not with her attorney. Mrs. MacKay signed the agreement on March 2, 1983, and made a deposit toward the entry fee on that date. On June 16, 1983, upon payment of the remainder of the fee, she moved in.

Mrs. MacKay became sick on December 29th of that year, and she was moved to the LVL Nursing Care Center. Two days later, after being transferred to a local hospital, she died.

## I. The Terms of the Agreement

Under the Residence Agreement, the entry fee of $36,950 entitled Mrs. MacKay to occupy a one-bedroom unit with a fully-equipped kitchen for the rest of her life, and guaranteed her admittance to the LVL Nursing Care Center whenever required. She was also required to pay a Monthly Service Fee (MSF) of $537.00 to cover such things as a daily meal, tray service when needed, building and grounds maintenance, laundry service, transportation services, utilities, basic or skilled nursing, special medical diets, planned activities, bi-weekly cleaning of the unit, parking, use of common areas, etc.

Because of certain medical services provided by LVL, Mrs. MacKay was required to have Medicare A or B coverage and at least one tie-in health insurance policy. The Nursing Center would provide care for any condition other than psychiatric problems, legal insanity or dangerously contagious diseases. There was no time limit on use of the Nursing Center; however, if Mrs. McKay were confined there permanently or for an extended period, LVL had the right to reassign her unit. She was guaranteed a similar unit should she recover sufficiently to resume independent living.

Mrs. MacKay had the right to terminate the agreement on ninety days' notice, if she were able to live alone, and if the MSF was current and fully paid. LVL would then refund the entrance fee less "10% plus 1% for each month of residency."

LVL also had the right to terminate the agreement if the resident created a significant disturbance within the center or contracted an illness which rendered her presence detrimental to the health, safety or peaceful lodging of others; or if she refused to pay the MSF and remained in default for ninety days. In each of those instances Mrs. MacKay would receive the same refund as if she had terminated the agreement. In addition, the contract specifically provided that:

It is the declared policy of the Center that a Resident's residency shall not be terminated solely by reason of financial inability of the Resident to pay the Monthly Service Fee, provided the Resident has applied for and established the facts which justify special financial consideration. Such consideration shall be granted at the sole discretion of the Board of Directors of the Center.

To cover a resident's potential inability to pay, and the possibility that some residents would require more care and expense than anticipated by the fees, Paragraph I(J) of the contract provided for no refund of the entry fee upon a resident's death:

If a resident passes away after taking residency in the Center, the obligation of the Center * * * shall be fulfilled, and there shall be no repayment of any portion of the Entrance Fee.

Mrs. MacKay fully understood and accepted that provision when she signed the agreement.

## II. Adhesion Contract

On appeal, Guthmann renews his argument that LVL should be required to refund Mrs. MacKay's entry fee because the Residence Agreement is an unenforceable adhesion contract.

■ Guthmann cites *Albuquerque Tire Co. v. Mountain States Telephone and Telegraph Co.*, 102 N.M. 445, 697 P.2d 128 (1985), for the proposition that an adhesion contract is per se unenforceable. That case did not go so far. A court will refuse to enforce an adhesion contract or a provision thereof only when the contract or provision is unfair. *See Steven v. Fidelity Casualty Co. of New York*, 58 Cal.2d 862, 879, 882–83, 27 Cal.Rptr. 172, 183, 184–85, 377 P.2d 284, 295, 296–97 (1962); C. Kaufman, *Corbin on Contracts* § 559A (Supp. 1984). The determination that a contract is one of adhesion is simply the first step in deciding whether it should be enforced.

■ Three elements must be satisfied before an adhesion contract may be found. First, the agreement must occur in the form of a standardized contract prepared or adopted by one party for the acceptance of the other. *Albuquerque Tire.* Second, the party proffering the standardized contract must enjoy a superior bargaining position because the weaker party virtually cannot avoid doing business under the particular contract terms. *Id.* Finally, the contract must be offered to the weaker party on a take-it-or-leave-it basis, without opportunity for bargaining. *Id.* LVL's contract with MacKay does not satisfy either the second or third elements.

The LVL Residence Agreement is a standard form contract. The trial court found that Mrs. MacKay was aware of and had considered other retirement communities and chose LVL. It concluded that "[t]he MacKay Agreement is not * * * an actionable contract of adhesion."

A party may be deemed unable to avoid doing business under the terms of a standardized form contract "when the dominant contracting party *has monopolized* the relevant geographic * * * market or when all the competitors of the dominant party use essentially the same contract terms." (Our emphasis.) *Albuquerque Tire*, 102 N.M. at 448, 697 P.2d at 131. There was testimony that at the time MacKay investigated the various retirement centers, the only other life-care facility in the limited Santa Fe/Albuquerque area offering similar amenities had a waiting list of one year and, according to Guthmann, "she wanted to settle someplace else." Other local facilities provided varying quarters and services under varying terms. The evidence was, however, that Mrs. MacKay selectively chose LVL's offering as the most desirable for her needs and wishes. The trial court made no specific finding that the contract was or was not offered to MacKay on a take-it-or-leave-it basis with no opportunity for bargaining. It did, however, refuse plaintiff's requested finding that "MacKay had the choice only of accepting and signing the 'Residence Agreement' or rejecting it."

■ Lack of opportunity to bargain may be proven by showing that the dominant party has been granted a monopoly, or that it afforded no opportunity to negotiate, or that the weaker party attempted to negotiate and failed. *See Albuquerque Tire*, 102 N.M. at 449, 697 P.2d at 132. Mrs. MacKay's close friend was present when LVL's representative discussed the contract terms, and she testified that Mrs. MacKay did not express any wish to alter or negotiate the contract terms, but knew that if she didn't like the contract she didn't have to sign it. She heard the LVL representative explain the no-refund provision to Mrs. MacKay, and heard her reply, "That's fine with me. I have no one to leave my money to anyway."

**510**

An absence of opportunity to bargain is relevant only where the weaker party to a standard form contract objects or has reason to object to one or more of the contract terms. There is no evidence in this case either that Mrs. MacKay objected to the no-refund provision, or was not satisfied with the contract terms. Based on the record and the trial court's findings and conclusions, we are persuaded that the Residence Agreement is not a contract of adhesion.

## III. Unconscionability

If there has been "an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party," a contract may be held to be unconscionable. *Bowlin's, Inc. v. Ramsey Oil Co.*, 99 N.M. 660, 668, 662 P.2d 661, 669 (Ct.App.), *cert. denied*, 99 N.M. 644, 662 P.2d 645 (1983) (quoting *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C.Cir.1965)). Lack of meaningful choice relates to a procedural analysis of unconscionability and is determined by examining the circumstances surrounding the contract formation, including the particular party's ability to understand the terms of the contract and the relative bargaining power of the parties. *Bowlin's, Inc. v. Ramsey Oil Co., Inc.; In re Friedman*, 64 A.D.2d 70, 407 N.Y.S.2d 999, 1008 (1978); *Williams v. Walker-Thomas; Bennett v. Behring Corp.*, 466 F.Supp. 689, 696 (S.D. Fla.1979), *appeal dismissed*, 629 F.2d 393 (5th Cir.1980). Substantive unconscionability is concerned with contract terms that are illegal, contrary to public policy, or grossly unfair. *Bowlin's, Inc. v. Ramsey Oil Co.; cf. Smith v. Price's Creameries*, 98 N.M. 541, 545, 650 P.2d 825, 829 (1982); *Hernandez v. S.I.C. Finance Co.*, 79 N.M. 673, 675, 448 P.2d 474, 476 (1968). The weight given to procedural and substantive considerations varies with the circumstances of each case. *In re Friedman.* Guthmann contends that the no-refund clause of the LVL contract is both procedurally and substantively unconscionable.

### (A) Procedural Unconscionability

Plaintiff argues that no "meaningful choice" existed because (1) the only other local "life-care" center that was acceptable to his decedent had no immediate openings; (2) the contract was presented in a standardized printed form on a "take-it-or-leave-it" basis, and (3) LVL did not fully disclose the value of the rights and services the deceased was to obtain under the contract.

A contract is procedurally unconscionable not merely because of inequality in bargaining power, but only where the inequality is so gross that one party's choice is effectively non-existent. *See Bennett v. Behring Corp.; Williams v. Walker-Thomas; Jones v. Star Credit Corp.*, 59 Misc. 2d 189, 298 N.Y.S.2d 264, 266–67 (1969). Factors to be considered include the use of sharp practices or high pressure tactics and the relative education, sophistication or wealth or the parties, as well as the relative scarcity of the subject matter of the contract. *See Williams v. Walker-Thomas; In re Friedman,; Jones v. Star Credit Corp.; City and County of Honolulu v. Midkiff,* 62 Hawaii 411, 417–18, 616 P.2d 213, 218 (1980).

Guthmann admits that Mrs. MacKay was not subjected to high pressure tactics, that she read the contract in its entirety, and that she fully understood the implications of all of its terms. The record reveals that she had engaged in extensive comparative shopping and had discussed the contract at length with both the LVL representative and her close friend. She also had a lawyer available for consultation, though she declined his offer to review the contract for her. There is nothing to indicate that her health or financial circumstances required her immediate admission to LVL or to any other similar facility.

The trial court found that "MacKay had a net worth exceeding $100,000 after paying her entrance fee. She also had a monthly income exceeding $1,200." Guthmann challenges this finding "on grounds of relevance."

Mrs. MacKay's financial independence is not irrelevant. Consumers who successfully assert unconscionability usually are poor or otherwise disadvantaged. *Bowlin's, Inc. v. Ramsey Oil Co.* Businessmen and middle-class purchasers are not ordinarily victims of the kinds of gross advantage-taking that constitute unconscionability. *Id.* As the deceased's close friend testified:

> She was a very smart woman. The fact that she divorced fifty years ago and had no skills whatsoever and got a job to support herself and left a very healthy estate says something about the woman.

None of the circumstances surrounding formation of the contract between LVL and Mrs. MacKay lead to a conclusion that it was procedurally unconscionable.

### (B) Substantive Unconscionability

Challenging several findings of fact, Guthmann contends that the no-refund clause of the agreement is substantively unconscionable both on its face and as applied to Mrs. MacKay.

When terms are unreasonably favorable to one party a contract may be held to be substantively unconscionable. *Bowlin's Inc. v. Ramsey Oil Co.; Williams v. Walker-Thomas.* The terms must be such as " 'no man in his senses and not under delusion would make on the one hand, and * * * no honest and fair man would accept on the other. [Citations omitted].' " *In re Friedman,* 64 A.D.2d at 84, 407 N.Y.S.2d at 1008.

> In determining reasonableness or fairness, the primary concern must be with the terms of the contract considered in light of the circumstances existing when the contract was made. The test is not simple, nor can it be mechanically applied. The terms are to be considered "in the light of the general commercial background and the commercial needs of the particular trade or case." Corbin suggests the test as being whether the terms are "so extreme as to appear unconscionable according to the mores and

> business practices of the time and place." [Citations omitted.]

*Williams v. Walker-Thomas Furniture Co.,* 350 F.2d at 450, *quoted in Bowlin's, Inc. v. Ramsey Oil Co.,* 99 N.M. at 668, 662 P.2d at 669.

Under the *Williams v. Walker-Thomas* test, a contract that does not violate public policy is not unconscionable unless one or more of its terms is grossly unfair under the circumstances as they existed at the time the contract was formed. Guthmann's argument of particularized unconscionability as to Mrs. MacKay rests on the event that occurred subsequent to the agreement, *i.e.,* Mrs. MacKay's totally unexpected death some six months after she entered the retirement center. Vitiation of a contract on a basis personal only to Mrs. MacKay—simply because of her untimely death—is not a circumstance of unconscionability recognized in the law. We turn, then, to the circumstances as they existed when decedent signed the contract to determine if gross unfairness occurred at that time.

It appears from the court's findings that Mrs. MacKay was well able to pay LVL's fees. This is, therefore, not a case asking relief from enforcement of an exorbitant price against an impecunious party. *Cf. In re Friedman; Jones v. Star Credit Corp.* Additionally, even though the residency fees were substantial, when a buyer is free to engage in comparative shopping, price alone will not render a contract substantively unconscionable. *Bennett v. Behring Corp.* Particularly must this be true when the item or service sought is not a business or personal essential. *Cf. Albuquerque Tire,* 102 N.M. at 447–49, 697 P.2d at 130–32.

When we look to the general commercial background and the commercial needs of the trade, *Williams v. Walker-Thomas,* to examine those circumstances at the time of the contract's formation, the trial court's Findings of Fact are informative:

1. La Vida Llena (LVL) is a non-profit New Mexico Corporation * * *.

* * * * * *

3. As part of a comprehensive plan of financing the construction and continued operation of the retirement center, LVL established a policy of giving no refunds of entrance fees for death after residency.

* * * * * *

11. The entrance fees paid by residents to LVL include monies to cover the cost of using the nursing care facility in the future if required because of deterioration in health of the resident.

12. LVL's entrance fees and monthly service fees paid by residents are reasonable and comparable to fees charged by other similar life care retirement centers.

13. The services provided by and contractual obligations of LVL to residents, especially as to health care, are substantially different in kind and quality from those provided by landlords of apartments and comparisons are not valid.

* * * * * *

17. The no-refund-after-death provision in the LVL Residence Agreement is not peculiar to it but is part of the financing structure of many continuing care retirement centers.

18. If LVL were to give refunds when residents die, entrance fees would have to be increased to maintain the same financial position of the Center.

19. The Residence Agreement between Kathleen MacKay and LVL is a reasonable and appropriate contract for its intended purposes, and no reason exists to refuse to enforce any of its terms.

■ Although plaintiff challenges Findings No. 1 and 3 "on grounds of relevance," clearly those are relevant facts concerning the commercial setting at the time of contracting. He also argues that Findings No. 12, 13, and 19 are not correct inferences to be drawn from the evidence. Additionally, Guthmann disputes the sufficiency of the evidence to support Finding 11. He bases that contention on the following language of paragraphs I(G) and II(B) of the contract, which state:

In consideration for the Entrance Fee * * * Resident shall have the right of residency * * * in the assigned living unit, including admittance to the Nursing Care Center * * *.

* * * * * *

For the payment of the Monthly Service Fee, the Center offers its Residents the following services and conveniences: * * * basic or skilled nursing care [in the Nursing Care Center].

Regarding Finding 11, plaintiff notes that the Monthly Service Fee, which may be increased at LVL's discretion, is used to pay LVL's operational expenses, including nursing care. He points out that residents in the Nursing Care Center must pay for two extra meals per day, and for their medications and doctor bills. Thus, he reasons, the right of admittance to the Nursing Care Center, given in return for part of the entrance fee, is nothing more than the bare right to enter the nursing facility.

The monies charged by LVL were explained by defendant's exhibits and witnesses. That evidence showed that some of the entrance fee is allocated as partial pre-payment of the anticipated cost of future health care; that residents were advised by LVL's accountants that $10,202 of the entrance fee and $190 of each MSF payment are tax-deductible medical expenses for the resident; that in return for the entrance fee, residents are guaranteed admission to the nursing facility and the right to remain there indefinitely with no additional *per diem* charge; and that the Medicare and tie-in health policies would provide limited coverage following a hospital confinement of at least three days. We see no conflict in the evidence and the court's finding.

With regard to the other findings attacked, the same facts as discussed above clearly support the court's Finding 13 that the services and contractual obligations of LVL are not comparable to those provided

by landlords of apartments. Finding 13 was not erroneous.

To challenge Finding 19, Guthmann analogizes this case to those wherein the court has refused to enforce the literal terms of a contract because to do so would result in a forfeiture which shocks the conscience. *See, e.g., Huckins v. Ritter*, 99 N.M. 560, 562, 661 P.2d 52, 54 (1983). He relies on cases disallowing forfeiture of an interest in real property when the purchaser defaults after paying a substantial sum on his obligation. The contract here, however, explicitly provides that a resident in the center acquires no interest in real property. Consequently, we do not feel that an analogy to forfeiture in real estate cases is appropriate.

In our view, the life-care contract in question is similar to a single-premium, life-only annuity agreement in which no minimum payment of benefits is guaranteed. Courts have consistently rejected the contention that death of an annuitant earlier than contemplated renders such contracts unfair or unconscionable. *See, e.g., Rishel v. Pacific Mutual Life Insurance Co. of California*, 78 F.2d 881, 883, 885, 887 (10th Cir.1935); 19 R. Anderson & M. Rhodes, *Couch Cyclopedia of Insurance Law*, § 81.6 (2nd ed. 1983), and cases cited therein.

The difference between the LVL entrance fee and a lump sum premium for a life-only annuity is that the latter most commonly is based on the life expectancy for persons of the annuitant's age, and the former is based on the average life expectancy of 12 years for retirement center residents in general. Benefits under both plans end upon death.

In his Reply Brief, Guthmann argues that because LVL reserved the right to terminate the agreement under certain circumstances, the agreement was not enforceable as a true life-care contract. The label of the agreement is not significant, nor was that issue raised in the Brief in Chief. Mrs. MacKay knew exactly what circumstances might trigger any termination, and she agreed to them.

Under the formula used by LVL, any termination of the agreement during the resident's lifetime would be accompanied by a partial refund of the entrance fee if the termination occurred within the first seven years of residency, because LVL would be deemed to have "earned" the entire fee after that time. Plaintiff does not take issue with the formula used to calculate the partial refund, but simply asserts that a refund should also be available to MacKay's estate because the *reason* for termination of the agreement "makes absolutely no difference to La Vida Llena either financially or otherwise." This argument contradicts the court's unchallenged Findings 17 and 18 and overlooks the heart of the bargain struck in this contract, *i.e.*, that when the resident dies, she will have received that for which she bargained—care for the remainder of her life—and that the center will provide it, no matter how long the resident lives.

The doctrine of unconscionability is designed to prevent oppression and unfair surprise, and not to disturb allocation of risks because of superior bargaining power. *Bernina Distributors, Inc. v. Bernina Sewing Machine Co.*, 646 F.2d 434, 440 (10th Cir.1981) (quoting U.C.C. § 2–302, comment 1); *Drink, Inc. v. Martinez*, 89 N.M. 662, 665, 556 P.2d 348, 351 (1976); *Hernandez v. S.I.C. Finance Co.* Here, Mrs. MacKay took the risk that she might die sooner than expected; LVL risked a lower entrance fee against the cost of a partial refund at death, as well as that Mrs. MacKay might live longer than seven to twelve years and thus use, to some extent, a portion of the fees paid by others who had died prematurely. It is therefore not unreasonable or unfair, nor unconscionable, for the parties to agree to no refund at death, and to no additional payments should the resident outlive her life expectancy.

Courts of other jurisdictions have recognized that the financing and financial feasibility of non-profit retirement facilities are predicated upon averages. *E.g., Bower v. The Estaugh*, 146 N.J.Super. 116, 369

A.2d 20 (App.Div.) *cert. denied,* 74 N.J. 252, 377 A.2d 658 (1977); *Gold v. Salem Lutheran Home Association of the Bay Cities,* 53 Cal.2d 289, 1 Cal.Rptr. 343, 347 P.2d 687 (1959); *Dodge v. New Hampshire Centennial Home for the Aged,* 95 N.H. 472, 67 A.2d 10, 10 A.L.R.2d 858 (1949); *Henry Keep Home v. Moore,* 198 Okl. 198, 176 P.2d 1016 (1947).

*Bower v. The Estaugh,* with which we fully agree, is directly on point. There the plaintiff's decedent had contracted for lifetime living accommodations and medical care in return for an entrance fee of $16,-750 and a monthly fee of $360. The contract expressly provided for no refund of the entrance fee upon death. Decedent died a month after entering the center. Denying the personal representative's claim that the non-profit retirement center had been unjustly enriched, the court said:

> The fact of Mrs. Pedlow's early demise is of no legal moment. The vast majority of cases uphold life-care contracts entered into between nursing homes and aged persons as not unfair, unconscionable or unjust, even if the resident dies a relatively short time after entering the home and before receiving benefits roughly commensurate with the value of the property received by the home. [Citations omitted.] It is reasonably foreseeable that death may occur at any time, and it is not unjust for each party to assume the risk that the predictable life span of the resident might vary. [Citation omitted.]

However, plaintiff argues that the present situation is different because certain provisions of the contract make it unenforceable as a life-care contract. We disagree. While the contract allowed the home to reasonably raise the monthly fee to meet justifiable cost increases, its

policy ... was not to dismiss any resident for his inability to pay but only for just and sufficient cause. The parties reached an agreement that for an entry fee and monthly payments defendant would provide decedent with certain care until her death or earlier termination of the agreement by either party. Defendant fully performed until the death of the deceased. Pedlow's early demise results in a benefit of sorts for defendant and others for whom it provides services, but the reverse was equally possible. It is no reason to now find the agreement was invalid.

> * * * With no evidence of undue influence or overreaching ... we see no basis for interfering with the obvious and expressed intention of the parties to the agreement.

> \*   \*   \*   \*   \*   \*

> The courts have long held that agreements by charitable organizations to provide life care for the aged in return for property or money are ill defined as wagering contracts and not against public policy. Such homes provide a needed service.

146 N.J.Super. at 120–22, 369 A.2d at 22–23.

There is ample support for the findings and decision of the trial court. The judgment is AFFIRMED.

RIORDAN and STOWERS, JJ., concur.